Argued May 3; reversed May 17, 1949

# RIESLAND *v.* RIESLAND

206 P. 2d 96

*W. F. Brownton,* of La Grande, argued the cause and filed a brief for appellant.

*S. H. Burleigh,* of La Grande, and *Mood W. Eckley,* of Portland, argued the cause for respondent. With Mood W. Eckley on the brief were Dixon & Burleigh, of La Grande.

Before LUSK, Chief Justice, and BRAND, ROSSMAN and BAILEY, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a decree of the Circuit Court which awarded to his wife, the

plaintiff, a divorce, the custody in general of their fourteen-year-old son, a one-half ownership in some real property the title to which stood in the defendant's name, and some incidental relief. The complaint charged the defendant with cruel and inhuman treatment. The answer and cross complaint denied the charges and by way of cross complaint accused the plaintiff of desertion and of cruel and inhuman treatment.

The appellant submits two assignments of error:

"The Court erred in not holding that the alleged conduct of the defendant had been condoned by the plaintiff, and erred in granting a decree of divorce to the plaintiff."

"The Court erred in not granting the defendant a decree of divorce upon the ground of desertion."

The parties, upon becoming married August 21, 1923, made their home in La Grande. The appellant operated a small garage in La Grande in which he repaired automobiles and sold parts and gasoline. He continued that business until April, 1946. Two sons were born to the union. One of them, twenty years of age at the time of the trial, is enlisted in the United States Army. The other is fourteen years of age. Some months after the parties were married, the plaintiff, in order to supplement the family income, went to work in the defendant's garage where she sold gasoline, checked oils and kept the books.

The parties had many quarrels and embroilments. Sometimes the trouble was attended by the use of force. Seemingly, when something occurred which either misunderstood, no effort was made to analyze the situation but they resorted to argument. They had never learned that argumentation is the enemy of marital happiness.

The respondent testified: "We would usually get it started. He would keep the ball rolling; last about three days before things settled down again." She also said: "I would hold my tongue as long as I could and then I might fly off." The appellant attributed to his wife a violent temper, and added: "She would get mad and holler and yell." Although words were the principal weapon that they used, sometimes physical violence was employed.

Atypic though it may be, it does not seem that the disputations resulted from a lack of affection on the part of either for the other. At any rate, the wife while testifying did not assert that she disliked her husband, and he did not mention any lack of love upon his part for his mate. After the respondent left her husband and took up her abode in Portland, she wrote him letters in which she coaxed him to come to Portland for such occasions as Christmas, and even urged him to move to Portland. In testifying, she said: "I did everything under the sun, and so did the boys, and they begged and pleaded. I would have been perfectly willing to have him come down there and make a home for us." Evidently she had not lost her affection for her husband. The trial court's memorandum opinion said:

> "There is no question in my mind but what the plaintiff thought a great deal of the defendant, and the defendant thought a great deal of the plaintiff, and that love and affection continued for a good many years and through some stormy scenes."

Neither party, in mentioning the embroilments, was specific. In the main, each used general terms and omitted mention of time, place and cause. The testimony shows that the home and the garage were at times scenes of hostilities, but it is difficult, if not

impossible, to ascertain from the evidence which of the parties started the trouble, and likewise we can not determine from anything before us whether either of them had the good sense to endeavor to end the disputes. In only one or two instances is it possible to ascertain the specific incident which brought on the trouble.

The trial court's memorandum opinion, referring to the appellant, said:

"He was careful to say very little that would impugn her character, conduct, language or motive. Perhaps he could have said more but he did not."

We think that the respondent, in testifying, did not minimize her husband's faults.

Although the testimony, couched as it is in terms that are general and at times vague, reveals that the parties engaged in numerous onsets, yet their attitude towards their domestic strife appears to have been complacent. The respondent explained: "Most every family has their ups and downs." And the appellant viewed the situation in the same manner.

According to the respondent's express statement, she feared only once that harm would befall her. The occasion was in 1936 when she engaged her mother-in-law in a fracas. At its conclusion the respondent took $200.00, which the couple had saved to pay taxes, and went to Portland.

The respondent attributed virtually all of the domestic strife to the fact that her mother-in-law was a member of the household. Upon becoming married, bride and groom took up their abode in a house which the appellant's mother owned, and the latter lived with them until some time in 1939. While the respondent worked in the garage, her mother-in-law did the

housework and the cooking. The respondent soon came to dislike her mother-in-law and before long bitterly hated her. She admitted that she applied to the elderly woman profane and obscene terms. She claimed that in her imbroglios with her mother-in-law, the appellant took sides against her. Referring to her mother-in-law, she testified: "She was the cause of everything." We think, however, that there were other causes of the domestic strife, although the presence in the household of the appellant's mother was the principal one. The others may be summarized as follows: (a) The respondent undertook to keep the garage's books, but had neither training nor natural aptitude for that kind of work. When she needed money for household or other purposes, she put into her purse the needed amount and failed to make any entry of the matter. That fact and her refusal to use the adding machine brought on quarrels. (b) Lack of sufficient income contributed to the discord. The appellant testified: "Maybe if we had more money we wouldn't have so many of them (quarrels)." (c) Similarity of temperament, or at least an equal propensity on the part of each for rushing into arguments, contributed to the difficulties.

Even though mother and father had their quarrels, yet each was fond of the boys and the latter liked their parents. So far as we can ascertain from the record, the only vice which either spouse possessed was the curse of an unbridled tongue. Although the domestic life of the parties was at times turbulent, nevertheless they prospered. The appellant purchased the building which housed his garage and the land upon which the building stood. He managed to pay the purchase price. In 1939 or 1940 he purchased an additional lot upon which stood a dwelling house. He could pay only

$250.00 cash on the purchase price, but later discharged the balance. The evidence indicates that the two properties are worth about $15,000.00. In 1946 he sold the equipment of the garage for $7,500.00. Thus, the parties, notwithstanding their lack of cash, had assets worth about $22,500.00. In addition, the appellant some years ago purchased 480 acres of timberland. Although the evidence is not clear, it seems to warrant a belief that the timberland is worth not less than $2.00 an acre. The memorandum opinion says: "They could be happy together. Together they have enough property and assets to tide them over their declining years. Alone, with assets divided, the road will be more rocky."

We mentioned the fact that one of the causes of the domestic strife was the respondent's intense hatred of her husband's mother. In the latter part of 1939 the mother left the home of the parties and took up her residence in Salem. A year or so later when she returned to La Grande she made her home there with a niece. The trial of this suit occurred in the spring of 1948 and, accordingly, about eight years before the trial the mother had ceased to be a factor in the home of the parties. According to the respondent, her domestic life took a more favorable course when her mother-in-law left her house.

In the summer of 1942 the appellant discontinued his garage business and thereupon the respondent was freed from the duties which she had previously performed in the garage. This development must have promoted tranquillity in the relationship of the parties to each other. When he discontinued his garage business, the appellant entered the employment of the Federal Government as operator of a welding school in which people who wished to engage in shipbuilding

were trained. His salary was $300.00 monthly, and some of his teaching was performed in the city of Baker. His periods of absence from La Grande must have been another factor tending to alleviate the domestic tension.

The respondent left the family home in the latter part of 1939 or the early part of 1940, remained away three months and then returned. The conjugal relations were thereupon fully resumed. The record does not disclose with certainty the cause of the reunion, but we think that it can be surmised. Husband and wife were equally interested in their children, and the two had worked hard to accumulate their properties. Those two facts were bonds that could not be easily dissolved. Neither had any vices, as we have already said, except quick tempers and unbridled tongues. Since each had these faults, neither was in a position to condemn the other without equally condemning himself. So far as we can ascertain, neither husband nor wife ever claimed that the other was solely to blame for the family discord, and three months of separation, accompanied by the departure from the home of the appellant's mother, convinced both, so we think, that they should try once more to make a success of their marriage vows. If any act of cruelty occurred after the reunion, the respondent failed to designate it while testifying.

When the reunion was effected, the couple resumed their domestic life, as we have indicated, under the most propitious circumstances that had greeted them since they became married. The appellant's mother had left the home some time previously, and a few months after the reconciliation the appellant obtained his employment with the Government which brought into the family exchequer a monthly salary of $300.00. In addition to that income, the couple obtained rental

from a house which they owned and after the appellant had discontinued his garage business he rented the structure at a rental of $50.00 per month. Thus, the family now had a good income and fortune at last began to smile upon them. But the bright prospects were doomed to disappointment. The respondent became a pupil in her husband's welding school and shortly found irresistible the calls that emanated from the Portland war industries for welders.

December 7, 1942, the respondent left La Grande for Portland and never thereafter returned to her home except for short visits. We now quote from the record, the witness being the respondent:

"Q. Now you had, I understand, some difficulties of some kind with Mr. Riesland before you left. What were they?

"A. Before—

The Court: In 1936?

Mr. Brownton: In 1942, before she left the last time.

"A. I don't remember any difficulties. I did go down there and go to work; that was all. I had taken this welding and, of course, after I learned welding —they were in such demand for welders, I had to go.

"Q. You had been getting along all right with Mr. Riesland a few months before you went down?

"A. I did for a while.

"Q. So, at the time you went, in December, 1942, it was not because of any fear for yourself or the children?

"A. No, not that time, because his mother was —his niece had taken his mother.

\* \* \*

"Q. So at least there have been a couple of years there before you went to Portland, that Mr.

Riesland's mother was not living in the home where you were living?

"A. That is right.

\* \* \*

"Q. So that you had taken a welding course and made up your mind you wanted to go to Portland and get a job; and the war was on.

"A. Yes.

"Q. You wanted a job in the war industry?

"A. Yes.

"Q. And that was your primary purpose in going?

"A. Yes."

It is clear that her final departure from her home was not preceded by any misconduct upon the appellant's part. She left because she wanted to work in the Portland war industries. Her departure for Portland may have been attended by patriotic motives, but it is clear that it was not due to any misconduct of her husband.

Upon reaching Portland the respondent worked in the shipyards for nine months, then worked for four months in an automobile service station, and, finally, embraced her present employment, nursing. After her departure she wrote her husband some letters, several of which are before us as exhibits. As we have said, they urged him to come to Portland and there establish a home for the family. Some of them stressed his duty to his boys, but none of the letters attributed to the appellant any cruelty. After the respondent had lived in Portland for a short time she made up her mind that she would not return to her home. Life in the large city had won a devoted convert.

The above is the story of the marital lives of these two people. We have considered carefully all phases

of the evidence and believe that it is unnecessary for us to express ourselves further. Nothing has been overlooked.

The appellant's answer prayed for a decree of divorce in his favor upon the grounds which we have mentioned. During the oral presentation of this case, his counsel expressly stated that although he believed that the appellant was entitled to a divorce, the appellant did not wish the entry of a decree dissolving the marriage ties.

Tested in the crucible of a divorce suit, no very serious flaw was revealed in either husband or wife. Of course, a tendency to disputation, especially when often yielded to, is a defect in anyone's nature, and yet it is by no means the greatest of evils. To the credit of this couple are two sons and a reasonable accumulation of worldly goods. Husband and wife have been good parents and have not been lacking in acquisitiveness. Further to their credit is the fact that they have been able to forgive much and, thereby, neither has lost all affection for the other. Each evidently realizes that the blame for their unhappy experience is, in part at least, his own.

We know of no legal issue in this case which is not controlled by the simple principles which govern recrimination. Those principles were recently stated and applied in *Fritz v. Fritz,* 179 Or. 612, 174 P. 2d 169, and *Hollingsworth v. Hollingsworth,* 173 Or. 286, 145 P. 2d 466. No one can demand from the marriage rites a perfect mate, and no one has just cause for complaint if he himself possesses defects that are the counterpart of those in the spouse.

■■ Divorce is a remedy for those who are without substantial fault, and it is not available to those who

contribute their share to the marital discord. We think that the respondent was equally at fault. Her tongue was at least as active as the appellant's. We can not condone the latter's conduct in throwing objects when he became nettled, but are satisfied that he was not alone in abandoning himself to fits of temper. When he had the good sense of withdrawing his aged mother, whom he revered to a commendable degree, from the family home for the purpose of improving the prospects of harmony, the respondent soon abandoned the domestic establishment and became enamored with life in the big city. We repeat, the respondent was not without substantial fault.

The decree of the Circuit Court is reversed. Relief will be awarded to neither party.