SHAW, Respondent, *v.* SHAW, et al., Appellants.

No. 8846

Submitted February 17, 1949. Decided June 27, 1949.

208 Pac. (2d) 514

594

Messrs. Swanberg and Swanberg, Great Falls, for appellants. Mr. Randall Swanberg argued the cause orally.

Oskar O. Lympus, Missoula, for respondent. Mr. Lympus argued the cause orally.

MR. CHIEF JUSTICE ADAIR:

Appeal by defendant husband from decree of divorce entered against him.

The parties intermarried January 20, 1922. The age of the groom was then 27 years while that of the bride was 44 years. The bride was a widow with two sons aged 21 years and 19 years respectively, they being the issue of a former marriage. No issue was born of the marriage to Shaw.

The husband, Curtis B. Shaw, served overseas in the military

forces of the United States during World War I, from which service he was honorably discharged on August 19, 1919, under disabilities rated at fifty percent, entitling him to a government pension, first of $40 per month but, upon enrolling for government vocational training, increased to $132.50 per month.

At the time of the marriage Shaw was taking vocational training at a government vocational school located at Helena, Montana, where the couple established their home and resided until in the spring of 1922, when they moved to Aitken, Minnesota. There, with funds and aid supplied him through the United States veterans' administration, Shaw purchased a farm, taking the title in his name alone. He improved and operated this farm until the fall of 1926, when, on account of the poor health of his wife and her wish to return to Montana to be with her aged and ailing mother, Shaw sold his livestock, farm equipment and other personal property at public auction, leased his farm to a tenant and came to Hobson, Montana, where his wife's mother resided.

While in Hobson, the couple jointly purchased a dwelling there which they later sold. The proceeds of such sale they divided equally on a fifty-fifty basis.

While living in Hobson, Shaw also operated a trap line realizing about $2,800 from the pelts sold. Shaw also expended considerable time and labor in repairing, reconditioning and improving seven houses in Hobson, five of which his wife owned and the other two she controlled and managed, having taken them as security for the payment of a loan or loans which she had made to her sister. Without pay, Shaw dug cesspools, repaired chimneys and porches, installed plumbing and water and sewer pipes for these houses and on one he built a new kitchen.

In the fall of 1927 Shaw set about building a service station at Stanford, Montana. His wife, desiring to be cut in on the venture, purchased the lot for the station and the tile of which it was to be constructed, paying therefor and taking title in her name alone. The equipment and stock of merchandise for the business was purchased by Shaw with his separate funds. Shaw

operated the station until 1929 when it was sold at a profit. Of the proceeds of such sale the wife received $3,500 for the $1,400 which she had invested and the balance, amounting to $1,500 and representing the amount paid for his equipment and stock of merchandise, went to Shaw.

About 1930 Shaw sold his Minnesota farm for $4,500. This money he deposited in the bank in his separate account and to his credit alone.

In 1931 Shaw filed on a homestead in the Fairfield, Montana, irrigation project, a development under the United States veterans' administration, on which homestead he and his wife resided until the year 1934, at which time Shaw suffered a rupture for which he was hospitalized for a time at the United States veterans' administration hospital at Fort Harrison, Montana. Upon leaving the hospital, and acting upon the advice of his doctors, Shaw sold his homestead, which stood of record in his name alone, for a consideration of $4,500. This money he deposited in the bank in his separate account and to his credit alone.

In 1935 Shaw, with his own money, purchased a dwelling in the town of Fairfield, taking title in his name alone, and there he and his wife made their home until the fall of 1944.

After selling his homestead Shaw engaged in trucking, commencing on a small scale but gradually building up a substantial business which he subsequently sold for $10,000. With $6,000 of the money so received Shaw purchased a 160-acre irrigated farm near Fairfield, taking title thereto in his name alone. This farm he still owns.

Shaw was next appointed deputy sheriff and town marshal at Fairfield, a town of about 600 inhabitants.

In the spring of 1944 Shaw became seriously ill, bedridden and under a doctor's care for a number of months. In the summer of 1944, when his condition had somewhat improved, Shaw decided to sell his dwelling in Fairfield and accept a position on the Pacific coast as plant guard for the Boeing Aircraft Company.

After entering into a contract to sell the dwelling for $3,625,

payable in installments, Shaw received a telegram from the Boeing Company advising him that the position with such company would not be available at that time. Thereupon the plan of removing to the Pacific coast was abandoned and, upon surrendering possession of the dwelling in Fairfield, on September 3, 1944, Shaw left for Texas while his wife left for Missoula, Montana, where one of her sons resided. Upon arriving in Austin, Texas, Shaw obtained employment on the Texas border patrol. After several months he left the patrol and went to Los Angeles, California, where he became a patrolman on the police force of that city. A short time later he was made sergeant of police, which rank he held at the time of the trial.

Immediately after Christmas in the winter of 1944-1945, Mrs. Shaw journeyed to Los Angeles without informing her husband of her intention so to do and there remained for a number of weeks, without either contacting her husband or informing him that she was in California. Her excuse was that she was unable to locate him. Although admitting she knew he was then employed as a patrolman she made no inquiry of the police department to ascertain his whereabouts. Her excuse: "I was afraid of getting lost, and everything was new and I was all alone."

In the summer of 1945 Shaw returned to Montana for a time.

In July 1945 he visited his wife in Missoula, Montana. He also took her to Hamilton, Montana, where they had dinner.

In the first part of August 1945 Shaw and his wife were together in Kalispell, Montana. The wife testified she arrived in Kalispell on the evening of August 3, 1945. On her direct examination she testified: "Q. What time of day was that? A. It was 8:00 o'clock in the evening. Q. Did you spend some time with him there? A. I stayed all night till the next day waiting for the bus."

While in Kalispell on this occasion Shaw opened his strong box in the presence of his wife, taking certain papers therefrom and handing them to his wife who testified that she then saw in the box some series "E" U. S. War Bonds and certain certificates for designated shares of the corporate stock of the Ana-

conda Copper Mining Company and the International Harvester Company. The bonds and certificates were issued to and stood in Shaw's name alone.

Shaw then had considerable other property in Montana, standing in his name alone, including a 1940 model Chrysler automobile; certain loans made to various borrowers from his own money; the contract for the purchase of his dwelling in Fairfield on which more than $3,300 was then unpaid and to become due; a checking account of $8,496.64 in the Conrad National Bank of Kalispell, Montana; another checking account in the First National Bank of Great Falls, Montana; the 160-acre irrigated farm near Fairfield and the landlord's share (one-third) in the crops harvested on said farm.

On August 18, 1945, being two weeks after they were together in Kalispell and following the husband's return to Los Angeles, the wife, Pearl E. Shaw, as plaintiff, filed in the district court of Missoula county, Montana, this suit for divorce naming as defendants her husband, Curtis B. Shaw, The Conrad National Bank of Kalispell, and The First National Bank of Great Falls.

The complaint alleges: The residence of plaintiff (paragraph I); the marriage (paragraph II); that no issue was born of the marriage (paragraph III); that defendant "has been guilty of cruelty *and bodily injury* to and toward the plaintiff * * * existing and persisted in for a period of more than one year before the commencement of this action * * *." (Paragraph IV, emphasis supplied.)

Upon the filing of the complaint, the district court, without notice to any of the defendants, issued a restraining order impounding the husband's credits, bank accounts, money, papers and other property then situate in Montana.

Thirteen days later (August 31, 1945) the district court, without notice to any of the defendants, issued a second order making permanent its restraining order of August 18th, and appointing a receiver to collect, receive and take into his custody the property so owned by and standing in the name of the defendant husband.

The receiver qualified and took charge of the husband's property and withdrew his funds from the defendant banks and deposited same to the receiver's credit in the First National Bank of Missoula, Montana. Other funds belonging to the husband were afterwards deposited to the receiver's credit in the First National Bank of Fairfield, Montana.

The first notice the defendant husband had of the suit was when checks written by him on the defendant banks "bounced" and were returned to him unpaid by reason of the restraining orders and the taking over of his property by the receiver.

The husband retained counsel through whom he appeared in the action by general demurrer challenging the sufficiency of the complaint to state a cause of action. The demurrer was overruled, whereupon the defendant husband filed a separate answer and cross-complaint. The answer admits the marriage; the residence of plaintiff; that no children were born of the union and, by appropriate denials, places in issue the other allegations of the complaint. The cross-complaint alleges: The marriage; the residence of cross-complainant; that no children were born of the marriage; charges extreme cruelty and wilful desertion and prays that plaintiff take nothing and that a decree of divorce be granted to defendant husband.

By reply plaintiff placed in issue the affirmative allegations of the answer and the averments of the cross-complaint other than those as to the marriage, residence of the parties and that no children were born of the union.

Following a trial, the district court made written findings of fact and conclusions of law to which the defendant husband filed timely exceptions.

On February 20, 1948, decree was entered for plaintiff: (1) Dissolving the marriage; (2) awarding plaintiff "$18,942.88, by way of alimony and property settlement;" (3) ordering that the "receiver turn over to the plaintiff all of the money he has on hand, in the amount of $14,495.77, to apply toward the payment of said alimony and property settlement, and the balance of $4,447.11 is * * * made a lien upon all the right, title and in-

terest of the defendant of, in, and to the real property standing of record in the name of the defendant, Curtis B. Shaw, in Teton County," Montana; (4) decreeing to plaintiff "the right to execute on said property and to sell the same to satisfy the balance owing her on said award of alimony and property settlement;" (5) ordering that the receiver "obtain a transfer of the money on deposit with The First National Bank of Fairfield, Montana, in the amount of $1,070, and that he collect the monies owing" the husband on a certain mortgage "of the principal amount of $1,000.00, together with interest thereon * * * to apply on the amount * * * awarded the plaintiff;" (6) ordering "that the receiver continue his duties until discharged" by the district court; (7) ordering "that the defendant Curtis B. Shaw * * * sign any necessary releases or other papers to effect the collection of said monies by the receiver;" (8) ordering that the defendant husband "have as his own the farm near Fairfield, Montana, subject to the lien of the plaintiff;" (9) ordering that the defendant husband "have as his own the 1940 Chrysler automobile together with * * * the bonds, stocks and monies" then in his possession [being property then in California and beyond the reach of the court and its receiver]; (10) ordering that "plaintiff's attorney * * * is entitled to an attorney's fee of $1,000.00;" (11) ordering that "the receiver * * * is allowed a fee of * * * one per cent of the money received by him, and that if his additional duties justify it he shall receive additional fees in the discretion of the court;" (12) ordering "that the award of alimony and property settlement * * * shall bear interest at the rate of six per cent * * * until paid;" and (13) ordering "that the restraining order and injunction * * * remain in effect" restraining and enjoining the defendant husband "from selling or in any way disposing of or encumbering the farm near Fairfield in Teton County, until plaintiff is paid in full the amount awarded her in this decree."

The appeal is from the foregoing decree.

Mr. Pomeroy in his work on Code Remedies (5th Ed.), sec. 336 at page 516 says: "All of the codes require that the differ-

ent causes of action should be separately stated. In other words, each must be set forth in a separate and distinct division of the complaint or petition in such a manner that each of these divisions might, if taken alone, be the substance of an independent action. * * * That such a separation should be made, and each distinct cause of action should be stated in a single and independent division, so that the defendant may answer or demur to it without any confusion with others, is plainly indispensable to an orderly system of pleading, and is expressly required by all the codes; and in some of the States the courts have strictly enforced the requirement, and have thereby done much to prevent the formal presentation of the issues to be tried from falling into that confused and bungling condition which exists to so great an extent in certain of the States.'' See section 9130, R. C. M. 1935.

Here there is but a single complaint purporting to set forth a single cause of action, viz., an action for divorce. However, upon closer scrutiny there appears an attempt to unite in the one complaint various other separate causes of action, some of which belong to different, separate and distinct classes, being violative of the express provisions of section 9130, supra. Much of the confusion in the district court could have been avoided had plaintiff observed the statutes and rules of pleading or, had she been required to separately state and number her various causes of action when, on timely challenge the improperly united causes could have been stricken and the trial had on the issues presented. Because of the improper intermingling of different causes of action and the confusion of the issues, much irrelevant and immaterial evidence, wholly foreign to the issues in a divorce action, was received, thus adding further to the confusion.

The trial court made twenty-seven separate findings of fact. Nine of the findings state no facts other than by reference to the plaintiff's proposed findings which requires that this court search elsewhere in the record to ascertain the facts found. We disapprove of this practice. It is the trial court's findings and not the proposed findings of counsel that we are called upon to

review and they should be complete in themselves without reference to the handiwork of counsel.

For example: The court's second finding reads: "II. The court adopts, as the court's Finding of Fact II, the plaintiff's requested Finding of Fact No. II.". Eight other findings are of like character.

In the preparation of the transcript and briefs on appeal the rules of this court have been disregarded. Rule VIII requires that the transcript "shall contain an alphabetical index at the beginning." The transcript filed herein, comprising two volumes, contains one incomplete index preceding page 1 and a second incomplete index farther on at pages 36 and 37 of the transcript. Rule X requires that appellant's brief contain a concise statement of the case "referring to the page numbers in the transcript in such manner that pleadings, exhibits, evidence, orders and the judgment *may easily be found.*" Appellant's statement of the case makes no reference whatever to any page number in the transcript. The briefs of both appellant and respondent review the evidence in the case but each brief contains so many inaccurate references to the transcript as to make it most difficult to check the respective contentions of the parties against the record, thereby increasing the labors of the reviewing court. The first references to the transcript appearing in appellant's brief *incorrectly* refer to pages 234, 287 and 350 thereof but, upon checking, we find the correct citations to be pages 368, 342 and 395 respectively. Likewise in respondent's brief we are referred to pages 3 and 7 of the transcript and find the correct citation is found to be pages 40 and 44 respectively. The citations which follow are also erroneous.

Because of such disobedience of its established rules this court would be fully warranted in declining to consider the case further were it not for the unusual situation presented by the record and the gross injustice that would result from a summary dismissal of the appeal. See State v. Kacar, 74 Mont. 269, 275, 340 Pac. 365.

*Wilful Desertion.* Paragraph IV of the complaint alleges:

"That the latter part of August 1944 the defendant induced the plaintiff to sign a contract to sell their marital home * * * on the representation that they would move somewhere else together, but that after she had signed it and the home was disposed of the defendant told her that he did not intend to make a home for her and that he was leaving, and that she could not accompany him, whereupon he put her belongings in her car and it was necessary for the plaintiff to leave, and she did so leave on the 3rd day of September, 1944, and that ever since said time the defendant has neglected, failed and refused to provide that plaintiff with a home notwithstanding his ability to do so but that his *desertion* of the plaintiff was wanton and wilful, and that ever since that time and still continues to wilfully and wantonly *desert and abandon* the plaintiff * * *." (Emphasis supplied.)

In its finding of fact VI the district court, by adopting by reference plaintiff's requested finding of fact No. VI, found, inter alia: "That the defendant wilfully and wrongfully *deserted* and abandoned the plaintiff on the 3rd day of September, 1944, without just cause or provocation and against the wishes and without the consent of the plaintiff, and ever since that time has continued to and still does live separate and apart from the plaintiff * * *."

This is a finding that the defendant husband was guilty of "wilful desertion" as such term is employed in law and defined in our statutes on divorce. Secs. 5736, 5739, 5749, R. C. M. 1935.

Desertion and abandonment from September 3, 1944 (the date whereon plaintiff and defendant both left Fairfield, plaintiff going to Missoula and defendant to Texas) to August 18, 1945 (the date of the filing of this suit), even if proved, does not constitute a ground for divorce. Wilful desertion "must continue for the space of one year before there is a ground for divorce." Sec. 5749, R. C. M. 1935.

Clearly the allegations of the complaint are wholly insufficient to state a cause of action for divorce based upon wilful desertion. Accordingly the above-quoted finding of the district

court is erroneous and contrary to fact, law and the undisputed evidence herein.

*Wilful Neglect.* The complaint charges defendant with wilful neglect alleging that defendant "has continuously since the 3rd day of September, 1944, and still continues to *neglect* and abandon the plaintiff and that he has failed to provide her with any of the necessaries of life from and after the 3rd day of Sep tember, 1944, up to and including the present time, and that his failure to provide the plaintiff with a home or with the necessaries of life is without cause, provocation or excuse." (Emphasis supplied.)

In its finding of fact VII the district court, by adopting plaintiff's requested findings of fact Nos. VII and VIII, found, inter alia: "That since September of 1944, the defendant has not given or provided the plaintiff with any money whatsoever save and except the sum of $500.00 * * * and that the defendant has *wilfully and wrongfully neglected* the plaintiff without just cause or provocation." (Emphasis supplied.)

Wilful neglect "must continue for the space of one year before there is a ground for divorce." Sec. 5749, R. C. M. 1935. The alleged neglect from September 3, 1944 (when the parties left Fairfield), to August 18, 1945 (when suit was instituted), does not constitute a ground for divorce. Such allegations are wholly insufficient to state a cause of action for divorce grounded upon wilful neglect.

Further, the undisputed evidence is that notwithstanding that the wife had ample money of her own to provide her with all the necessaries and most of the luxuries of life, she also had received at least $800 from her husband during the time that she swears in her complaint "that he failed to provide her with *any* of the necessaries of life." The evidence fails to establish the charge and finding of wilful neglect.

*Jostling.* The complaint alleges: "That on or about the 1st day of September, 1944, in the garage of the marital home in Fairfield, Montana, the defendant *forcibly shoved and jostled* the plaintiff so that she forcibly fell upon the floor of the garage

and suffered *great bodily injury* and severe mental anguish, and that the defendant made no effort to help her up or to apologize, but treated her as he is wont to do, with utter contempt." This is the one and only "bodily injury" charged in the complaint and it was suffered less than a year before the commencement of the action. Acts of this character must have continued for "a period of one (1) year before the commencement of the action for divorce," sec. 5738, R. C. M. 1935, before they constitute grounds for divorce.

In support of the "jostling" charges plaintiff testified that on their last day in Fairfield (September 3, 1944) while she and defendant were in the garage, defendant pushed her, causing her to fall, and that he made no attempt to help her up nor did he make her an apology. She denied that her husband had accidentally backed into her while carrying a heavy object or that he had stumbled or that he had anything in his arms when he "jostled" her.

Defendant testified that at the direction of his wife he was engaged in moving one of her old trunks into a corner of the garage; that after he lifted the trunk which was quite heavy, and, as he was walking backwards with it, his feet became entangled in some ropes and rubbish causing him to stumble. He testified: "I stumbled and almost fell with the trunk on top of me, and when I stumbled I must have pushed her. There was no other way she could have been touched. I held my footing and kept the trunk from falling on me.

"Q. Did she fall, however? A. When I finally got the trunk down she was on her feet. * * *

"Q. Mr. Shaw, did you at anytime during your married life intentionally strike or push Mrs. Shaw? A. I did not.

"Q. Did you ever lay a hand on her in anger? A. I did not.

"Q. This incident you have just referred to, did you intend to push her? A. No, sir."

After hearing the above testimony plaintiff testified in rebuttal, but her counsel made no inquiry of her concerning de-

606

fendant's testimony that if plaintiff was "shoved" or "jostled" it was purely accidental and wholly unintentional on his part and plaintiff failed to deny or even mention any part of defendant's above-quoted explanation and testimony.

When asked if she and defendant had not had frequent quarrels particularly about moneys advanced him, the plaintiff testified: "I can't say we quarrelled. You can't quarrel with Mr. Shaw. He just don't talk back."

*Refusal to Associate.* The complaint alleges: "That for over two years last past the defendant has refused to associate with the plaintiff and told the plaintiff that she could no longer share his bed and has ceased and failed in every respect to be a companion to the plaintiff * * *."

On her direct examination plaintiff testified:

"Q. Now, you have alleged that from the time you filed the complaint and for two years preceding that your husband had refused to associate with you and had refused you sharing his bed. Will you tell the court concerning that, how that came about? A. Mr. Shaw had been very sick for a long time and I had laid on the davenport so he could have the bed and so I could get up at night. I didn't take my clothes off. After a couple of months he got feeling a little better and I said 'You are well enough now for me to go to bed. I don't get up any more at night with you.' He said, 'No I don't want you in my bed,' he said, 'I need all the room. *My legs and shoulders ache.* You go in the other room and sleep,' and I did.

"Q. From then on you slept in your own room by yourself? A. I did. One time I came in and laid down beside him and he jumped out of the bed and went into the bathroom and stayed.

"Q. That is, he just would have nothing to do with you at all? A. Yes."

On cross-examination plaintiff testified:

"Q. I believe you testified that at the time you and your husband started to sleep in separate beds, that was after he got sick, and he was very, very sick for a period of time? A. Yes.

"Q. When was that? A. That was the summer just before he went away, in the spring of the year.

"Q. 1944? A. Yes.

"Q. It was the last summer you lived together? A. Yes.

"Q. How long was he sick? A. He was quite bad over two months and still wasn't well when he left.

"Q. Did he have a doctor? A. Yes.

"Q. What was the nature of the illness? A. I asked the doctor one day, this was hanging onto Mr. Shaw so long, I would like to know what was the cause of it, and the doctor was in the kitchen with me, and he said, 'Well living in Fairfield, I would say it was the water and seepage from the irrigation.'

"Q. Something had been poisoning his system, is that it? A. It was poisoning his system.

"Q. Prior to that time you had always occupied the same bed? A. Yes."

We are of the opinion that the admitted serious ill health of the husband in the spring and summer of 1944 was such as to relieve him of some of his marital duties and to entitle him to indulge the luxury of twin beds at least until a measure of his erstwhile health and vigor had been restored.

The trial court's finding of fact V based upon the husband's refusal "to associate with the plaintiff" fails to take into account the husband's admitted long and serious illness, his weakened physical condition, his aching legs and shoulders, and the laws of nature. The finding is erroneous and contrary to the law and the evidence.

"*Other Women.*" The complaint alleges: "That on various * * * occasions the defendant had affairs with other women, and that in fact one such affair became so intolerable *fourteen years ago,* that plaintiff had to leave, and did leave the defendant for a period of time." (Emphasis supplied.)

The evidence on this charge is that in the fall of 1928 Mr. and Mrs. Shaw, accompanied by two friends, they being another married couple, drove in an automobile from their home in Hobson to Lewistown, Montana, a distance of 25 miles, where they

attended a card party at which Five Hundred was played. Shaw won the honors. As a prize he was presented with a dish filled with ice cream. At this Mrs. Shaw became so angry that she openly voiced to her hostess in the presence of the other guests her disapproval of the party, left her husband at the party and returned to Hobson alone. Shaw remained at the party an hour or so thereafter. Before the party was over, however, he returned to Hobson and found himself locked out of his home. Upon obtaining a key and unlocking the door, he found his wife in bed and all of his personal effects dumped in the middle of the floor. He undressed and retired whereupon his wife refused to occupy the same bed with him and went to another room where she slept for about a week, at the end whereof she went to the home of her son in Missoula where she remained for some time.

Plaintiff testified she remained away "about three weeks" while the husband testified: "She must have been gone about four months." Whether the time be weeks or months the undisputed evidence is that the wife condoned whatever occurred at the card party; that the parties adjusted their differences and continuously lived together as husband and wife for fifteen years thereafter. Plaintiff's testimony was: "I went back and we made up."

From a careful reading of the evidence we are satisfied that ▮ this was a simple case of jealousy on the part of the older spouse; that the husband had more cause for complaint than had the wife and that plaintiff and her counsel were indeed hard pressed for grounds on which to base this action when they pleaded and sought to rely on this stale and petty happening which the undisputed evidence shows had been fully condoned for fifteen years. It became and is "water over the dam" and cannot be made or considered a ground for divorce in this action.

The complaint also alleges: "That the defendant has for some two years been, and now is enamoured of and in love with a certain woman, who prior to about a year ago, lived in Fairfield, Montana. That the defendant was constantly in her company. * * * That the acts and conduct of the defendant * * * became

so notorious that they were * * * common street talk among the people of * * * Fairfield, and many people mentioned the matter to the plaintiff, and * * * plaintiff became greatly humiliated and mortified and * * * ashamed of meeting her friends, and shunned meeting people, and that it became impossible for her to tolerate the condition.''

Plaintiff's complaint is as to her husband's conduct while he was deputy sheriff and town marshal, and the only law enforcement officer in Fairfield. As such he was subject to twenty-four hours call each day including Sundays. Among his duties were inspecting brands, watching for fires, patrolling the town, including the streets, pool halls, bars and restaurants and maintaining law and order in Fairfield where there were three beer halls or bars which kept open until 2:00 o'clock in the morning.

The operator in charge of the town telephone exchange was a married woman. Her husband was the proprietor of a restaurant located in a pool hall in the town. The Shaws became acquainted with them in 1943. A family friendship developed and existed and the couples visited in each other's homes. Mrs. Shaw testified that she was acquainted with the telephone operator about eight months when the latter moved away from Fairfield. Mrs. Shaw crocheted a table cloth for the operator after first going to the telephone exchange and there taking the proper table measurements therefor. On one occasion Mrs. Shaw drove the operator to Great Falls, Montana, where they attended a show together. The operator frequently worked in her husband's restaurant. As Shaw was patrolling the streets in the performance of his duties he would stop and converse with the telephone operator. As he made his nightly rounds of the pool halls and restaurants he would see both the operator and her husband in the latter's restaurant and frequently sat in a booth with them talking and drinking coffee. In the spring and summer of 1944 when Shaw became stricken and confined to his home and bed the operator frequently called on him and brought him frozen fruits from the family locker.

Defendant testified that there was never anything improper

between him and the operator; that at no time did he ever make any appointment to meet her at any particular time or place nor did she ever accompany him to any town or city.

Defendant also testified that during their entire married life plaintiff had been very jealous and had repeatedly wrongfully accused him of having girls in other towns.

Plaintiff testified that for "about nine months" defendant and the operator "were very, very friendly;" that on one occasion she had seen them in the cocktail lounge of the Rainbow Hotel in Great Falls; that on another occasion she saw them in Choteau in the company of two other persons sitting in a booth "drinking something out of a glass;" that she had seen them in the Shaw home on one occasion "drinking coffee and eating cake" and "several times they were mixing drinks and drinking them in the home;" that twice she had seen them in the Project Bar in Fairfield "laughing and talking" and "maybe ten or twelve different times" sitting in the booth in the restaurant conducted by the operator's husband.

On her direct examination at the trial the plaintiff was asked by her counsel, Mr. Lympus, to tell the court in her own words what the situation was between her husband and the telephone operator to which defendant's counsel, Mr. Swanberg, objected and the following occurred.

"Mr. Swanberg: Just a moment. To which we object, if the Court please, unless she is going to relate facts which she knows of her own knowledge. We object to the introduction in evidence of any gossip or hearsay or any conclusion, or anything other than that which she knows from her own observation, and the question should be so framed.

"The Court: What are you charging, Mr. Lympus? Excuse me, were you through?

"Mr. Swanberg: Yes, your Honor.

"The Court: What are you charging? Adultery?

"Mr. Lympus: No, in this case the charge is that of extreme cruelty *and bodily injury* by the defendant upon the plaintiff."

Thus was it conceded by plaintiff's counsel at the trial that

plaintiff did not charge her husband with having committed adultery. It further appears from plaintiff's testimony that with full knowledge of the facts which she claims reveal his "very friendly" interest in the telephone operator plaintiff at all times not only stood ready and willing to overlook her husband's alleged short-comings and to become reconciled and to fully resume marital relations with him, but that she repeatedly solicited him to resume such relations with her. In view of the foregoing state of the record the trial court's findings, conclusions and decree are contrary to law and against the clear weight of the evidence. Compare: Riesland v. Riesland, Or., 206 Pac. (2d) 96.

The property which the wife owned before her marriage and ▉ that acquired afterwards is her separate property and the property which the husband acquired became and is his separate property.

The complaint affirmatively shows that the title to the property ▉ described in the complaint was in the defendant husband alone. It was and is *his* property and not that of plaintiff. The husband's title was neither affected nor divested by the commencement of this suit for divorce and the court clearly exceeded its authority in issuing the restraining order, in making such order permanent and in appointing a receiver to take charge of the husband's property. 4 Pomeroy's Equity Jurisprudence, 5th Ed., sec. 1345 b, note 1, page 947; Rufenach v. Rufenach, 120 Mont. 351, 185 Pac. (2d) 293; Emery v. Emery, 122 Mont. 201, 200 Pac. (2d) 251, 264, 265.

At the time she and Shaw were wed in 1922 plaintiff had about $75,000.00. At the trial plaintiff would admit suffering no financial losses or bad investments through the years other than the advancements aggregating $6,600 which she claims she made to her husband, most of which claims the husband denied and disputed.

At the trial plaintiff testified that for about thirty-five years she had been and still is extensively and actively engaged in loaning money on farms and other real estate and in buying and

selling property of various kinds. While plaintiff appears to have been most reluctant to disclose her true financial condition at the time of the trial and while her testimony with respect thereto is most vague, contradictory and evasive, yet it is quite apparent that she was at all times and yet is possessed of considerable wealth. The $75,000.00 which she had in 1922 when she married Shaw has been supplemented by additional money and property given her by her mother in the latter's lifetime and, after her mother's death, by other money and property received in 1937 from the mother's estate and in 1940 from the estate of her deceased step-father. The aggregate amount of this money and property, according to plaintiff's brief, would make "a total of $94,400.00."

When interrogated as to her assets at the time of the trial plaintiff testified: "I have some liberty bonds and a few loans. * * * I have $31,000.00 worth of liberty bonds." Again:

"Q. So that the forty-five thousand you have today comes partly from your late husband's estate and partly from your mother's estate? A. My mother's estate, I bought bonds and I use the interest. I use the interest and that is where the thirty-one * * *

"Q. That $31,000.00? A. Are bonds of mother's estate.

"Q. That came atogether from your mother's estate? A. I think that there might be a few hundred dollars that was put in with it to make up that amount."

Montana has no community property law and the statutes of this state have conferred no power upon the court in an action for divorce to divest the title of the husband to specific real or personal property or to adjudge or order an involuntary assignment or transfer thereof to the wife. Rufenach v. Rufenach, supra; Emery v. Emery, supra.

A husband and wife may hold real or personal property together, jointly or in common, sec. 5789, R. C. M., and the wife may, without consent, agreement and signature of her husband, transfer her separate property, real or personal, including the fee-simple title to real property or execute a power of attor-

ney for the conveyance and transfer thereof. Sec. 5792, R. C. M. 1935.

Under the law of this state it is the duty of the wife, without ▆ compensation, to attend to all the ordinary household duties and labor faithfully in the advancement of her husband's interests. Stefonick v. Stefonick, 118 Mont. 486, 501, 167 Pac. (2d) 848, 164 A. L. R. 1211; Gates v. Powell, 77 Mont. 554, 252 Pac. 377, 380; Emery v. Emery, supra.

"The law presumes that an advance of money by a wife to her husband is a gift, a gratuity; no contractual relationship is presumed, and no obligation arises therefrom. The allegation in the complaint that the husband had used money belonging to plaintiff for the payment of his own obligations does not tend to imply that the parties intended that any contract liability would arise. Therefore the respondent cannot and never could recover the money advanced by her. It may fairly be presumed that the money advanced was for the purpose of enhancing the value of the homestead, so that it cannot in any sense be considered a debt within the contemplation of the federal statute quoted." Bast v. Bast, 68 Mont. 69, 76, 217 Pac. 345, 347.

One spouse may not make a gift of property to the other and ▆ thereafter continue to be the equitable owner of such property, Lewis v. Bowman, 113 Mont. 68, 121 Pac. (2d) 162, and either spouse may acquire and hold property separate and apart from the other.

The power of courts in divorce actions is to be determined ▆ entirely upon the terms of the statutes conferring jurisdiction. We find no authority in said statutes which empowers the trial court to order the husband's property seized, impounded, or withheld under the facts here pleaded or shown nor was the trial court empowered to divest the husband's title to his property. Rufenach v. Rufenach, supra; Emery v. Emery, supra.

The assets of plaintiff far exceed those of the defendant husband and plaintiff, being possessed of ample means of her own, must pay for the services of the attorneys which she

employed to institute and prosecute this action. The obligation is that of plaintiff and not of the defendant husband.

The evidence offered by the husband in support of the averments of his cross-complaint are likewise wholly insufficient to sustain a decree of divorce in his favor. On the record before us neither the husband nor the wife is entitled to a decree of divorce. See Riesland v. Riesland, supra.

It was a clear abuse of discretion for the trial court: To issue the restraining and injunction orders; to appoint a receiver; to tie up and withhold from the defendant, Curtis B. Shaw, his bank accounts, credits, loans, crops and other property; to render a money judgment against him in this action in any sum; to attempt to divest the defendant husband of the title to any of his property, real or personal; or to dissolve the marriage.

The money, loans, and other property so wrongfully taken and withheld from the defendant, Curtis B. Shaw, by the wholly unwarranted orders of the district court are ordered released from all restraint and ordered returned to him forthwith.

The findings and conclusions of the trial court are vacated, the judgment and decree reversed, and the cause remanded with directions to dismiss the action with all fees and expenses of the receiver and all costs incurred by the defendant, Curtis B. Shaw, other than the fees paid defendant's attorneys, to be assessed against plaintiff.

Associate Justices Freebourn and Bottomly, concur.

MR. JUSTICE ANGSTMAN (dissenting):

In my opinion my associates have failed to apply certain fundamental principles of law in the foregoing opinion. It is well settled that in ascertaining the facts where the evidence is in dispute we accept that portion of the evidence which is most favorable to the prevailing party. This is due to the fact that the trial judge is in a more favorable position to determine the facts from conflicting evidence than are we.

When and if we accept the evidence in the record most favorable to plaintiff, as I think we are obliged to do, then much of

the feeling of prejudice against plaintiff and sympathy for defendant engendered by a reading of the majority opinion is dispelled.

Plaintiff's first husband died in 1915 leaving an estate then valued at about $50,000 but which was worth about $75,000 at the time she married defendant. There were also two children of her first marriage who are still living and who are entitled to two-thirds of the estate. The estate was never distributed. The two children, both being sons, in June 1927 signed a trust agreement permitting plaintiff to use and control the estate as a unit. The agreement provided that the income from the property should be divided equally between plaintiff and each of the two children and if plaintiff's share of the income was not sufficient to provide for her own support and maintenance that then she could use the portion of the income belonging to the children.

Plaintiff likewise inherited about $8,400 from her mother's estate in 1936 or 1937 and $1,000 from her step-father's estate in 1940. Her mother gave her about $10,000 before her death. Hence plaintiff had under her control during the existence of the marriage between plaintiff and defendant more than $94,-000. Defendant at the time of the marriage had $300.00.

Plaintiff is now able to account for only about $45,000 still in her possession. Her two sons have had nothing as yet from the estate of their father. During the marriage between plaintiff and defendant, plaintiff not only bought and paid for cows with which to stock the Minnesota farm and the homestead later settled upon in Montana, but milked the cows, pitched manure, fed pigs and performed other manual farm labor. She paid one-half of the expenses for running the home for the 23 years of the marriage between plaintiff and defendant. She bought and paid for all of her own clothing through the years. The trap line which the majority opinion says defendant operated at Hobson and realized $2,800 from pelts sold was flatly denied by plaintiff who says that defendant caught only one mink. Plaintiff advanced money to defendant whenever he needed it. Some

of the larger advances so shown by the record are the following: $3,500 for the purchase of cows and otherwise equipping the Minnesota farm; $450 for building a house on the Montana homestead; $400 for the purchase of cows placed on the homestead; $750 for a truck; $750 for a tractor; $750 for a trucking outfit; $1,400 for a loan to Ole Oschiness of Fairfield. Defendant received the benefit of all these advances and when the property was sold or the loan repaid defendant kept the proceeds. By this process defendant has increased the $300 which he had at the time of the marriage to about $40,000.00 which he now has. Plaintiff at all times was a dutiful wife and performed the obligations of her marriage to defendant.

The record shows that in 1943 defendant became acquainted with Georgia Morefield who then resided with her husband in Fairfield and worked in the telephone office. Plaintiff alleged and submitted proof that defendant became "enamored of and in love" with Mrs. Morefield. He paid so much attention to her that it provoked comment among the neighbors, many of whom spoke to plaintiff about it. This caused her humiliation and embarrassment. Defendant had her ride around with him in his car. He frequented bars in Fairfield with her and was seen with her in Great Falls. Plaintiff also, when a neighbor told her that defendant had gone to Choteau with her, followed him to Choteau and there saw him with her in a bar. This was in the early summer of 1944. The complaint was filed on August 18, 1945.

The conduct between defendant and Mrs. Morefield existed about nine months while they lived in Fairfield. Plaintiff and defendant sold out at Fairfield and left there in September 1944. Defendant's association with Mrs. Morefield caused plaintiff mental distress and destroyed her peace of mind and constituted cruelty within the meaning of section 5738, R. C. M. 1935.

There is evidence too that when defendant went to Los Angeles, California, Mrs. Morefield made her residence at Del Ray, California. My associates stress the fact that plaintiff went to Los Angeles and failed to look up the defendant. She testified

that whenever he wrote to her, which was about once in two months, he gave a new address each time; that she inquired at each address given but was not able to find him. Some of the letters which she had written to him were not received but returned. She said, ''I asked the policeman and I told him he was supposed to be some kind of police officer around there.'' She asked at the post office but was advised that they could not give the information.

Plaintiff testified that she read a letter written by Mrs. Morefield to Mr. Morefield in which she said: ''I am in love with Mr. Shaw and I am going down to California to see if I can forget him.'' After she so testified an objection was made and sustained but no motion was made to strike the testimony from the record.

That defendant lost interest and regard for plaintiff is shown by the fact that in September 1944 he deserted her and insisted that they live separate and apart. He has since that time neglected to provide for plaintiff. He shoved her so hard in their garage at Fairfield in September 1944 as to cause her to fall to the floor and sustain serious bodily injuries and made no offer to help her to her feet and made no apology. He testified that this shoving was accidental but the solution of the fact issue was for the trial judge who has found in plaintiff's favor on this as well as on other issues. In my opinion there was ample evidence to sustain the charge of cruelty.

Likewise my associates have misconstrued plaintiff's complaint. She is not seeking a divorce on the grounds of desertion or wilful neglect. The district judge did not grant a divorce on those grounds.

The complaint is based solely upon statutory cruelty as defined by section 5738, R. C. M. 1935, and particularly the latter part dealing with the infliction of grievous mental suffering by a course of conduct and treatment of plaintiff persisted in for more than one year, which was calculated and which is alleged to have destroyed the peace of mind and happiness of plaintiff and to have defeated the legitimate objects of marriage.

After scrupulously following the language of the statute, the complaint then alleges: ''That such acts and conduct on the part of the defendant consist in part of the following:'' Here then follows the allegations with respect to defendant's association with other women, his desertion of plaintiff on September 3, 1944, his wilful neglect of her, and the other acts pointed out in the majority opinion. The desertion, wilful neglect and the other acts alleged were not pleaded as separate grounds of divorce but as acts constituting the objectionable course of conduct amounting to statutory cruelty. That they were appropriate for that purpose there can be no doubt. See note in 157 A. L. R. 631; and see 27 C. J. S., Divorce, sec. 29, p. 559, where failure to support a wife is said may constitute cruelty. In other words, the desertion and failure to support is but a continuation of the course of conduct amounting to cruelty.

The excellent statement of law from Pomeroy's Code Remedies contained in the majority opinion has no application to this case where the complaint contains but one ground of divorce and but one cause of action.

May the court's order with respect to the property rights be sustained?

I agree that this court has held that advances made by a wife to her husband are presumed to be a gift. The case of Bast v. Bast, 68 Mont. 69, 217 Pac. 345, is illustrative. In Bingham v. National Bank, 105 Mont. 159, 181, 72 Pac. (2d) 90, 113 A. L. R. 315, I pointed out in my dissenting opinion that where a husband advances money to his wife it is presumed to be a gift but that the weight of authority refused to apply that rule to advances made by the wife to the husband. But even though we treat advances by the wife to the husband as gifts, still the rule under the Bast case is that: ''Contributions of money or property by a wife to her husband may be considered by the trial court in the light of circumstances affecting the amount of alimony to be awarded. The rule is laid down in 1 R. C. L. 931, as follows: 'Equity and good conscience require that the husband shall not profit by his own wrong in forcing his wife to divorce him, and

that restitution shall be made to her of the property which she brought to him or that a suitable sum in lieu thereof shall be allowed out of his estate'."

A receivership is expressly authorized by statute in this state. Section 5772, R. C. M. 1935, reads: "The court or judge may require the husband to give reasonable security for providing maintenance or making any payments required under the provisions of this chapter, and may enforce the same by the appointment of a receiver, or by any other remedy applicable to the case."

I think the district court did not abuse its discretion in appointing a receiver, nor do I think the court erred in requiring the husband to make the payments which the decree requires. In effect the court is simply awarding to plaintiff that which in equity and good conscience already belongs to her.

I concede that under Emery v. Emery, 122 Mont. 201, 200 Pac. (2d) 251, if the husband manages to get property in his own name even though purchased with the wife's money, there is not much the court can do about it. I did not agree with the majority opinion in the Emery case. I think it is unsound in law and establishes a rule lacking in fairness and justice. I hesitate to concur in that part of the majority opinion in this case which follows the Emery case, even on the ground of stare decisis and without making an effort to have it now overruled. I think we should overrule it expressly at this time.

If this decree cannot stand then it follows that it is becoming as difficult in Montana to obtain a valid decree of divorce and an adjustment of property rights between husband and wife as it is to obtain a valid tax title.

I think the decree should be affirmed.

MR. JUSTICE METCALF:

I concur with Mr. Justice Angstman in his contention that the divorce granted to the plaintiff by the trial judge should be sustained. Here the only cause of action for divorce pleaded is statutory cruelty by a course of conduct and treatment persisted

in for more than one year. The complaint alleged that defendant "has for some two years, and is now enamoured of and in love with a certain woman," causing shame and humiliation and mortification to the plaintiff. Such conduct is a cause of mental suffering and anguish that under some circumstances may so destroy the peace of mind and happiness of the plaintiff and render the continuance of the marriage relation intolerable. 27 C. J. S., Divorce, sec. 28, p. 551; 1 Nelson, Divorce and Annulment, 2d Ed., sec. 6.20, p. 269. The majority opinion points out that the complaint fails to allege that the wilful neglect and failure to provide continued for a year. The wilful neglect alleged began on September 3, 1944 and the complaint was filed eleven and a half months later on August 18, 1945. The same is true of the desertion. It is alleged the defendant abandoned the plaintiff on September 3, 1944, an abandonment that continued until the filing of the complaint. But in addition it is alleged that defendant failed to associate with the plaintiff for over two years and failed to permit the plaintiff to share his bed.

These various acts taken together comprise cruelty persisted in for more than two years. The majority breaks these acts into separate parts and points out that the desertion didn't exist for the full statutory period of one year, that the plaintiff was not wilfully neglected for the full statutory period, that the defendant's association with Mrs. Morefield did not last a full year. But as Justice Holmes said in Edwards v. Chile Copper Co., 270 U. S. 452, 46 S. Ct. 345, 346, 70 L. Ed. 678, the court "cannot let the fagot be destroyed by taking up each item of conduct separately and breaking the stick. The activities and situation must be judged as a whole."

The complaint states a cause of action for divorce. At the trial the plaintiff introduced substantial evidence in support of the allegations. The evidence is enough to sustain the trial judge in finding that defendant had pursued a course of conduct for more than two years that "destroyed the peace of mind and happiness" of the plaintiff and rendered the continuance of marriage relation unreasonable and intolerable.

The trial judge did not err in granting the plaintiff a divorce. He acted under the statute and in accordance with the evidence.

Most of the evidence in the record, a large portion of the findings of the trial court, and much of the discussion in the other opinions of this court is based upon criticism of the trial court's disposition of the property of the parties. Under the decisions of this court in Stefonick v. Stefonick, 118 Mont. 486, 167 Pac. (2d) 848, 164 A. L. R. 1211; Rufenach v. Rufenach, 120 Mont. 351, 185 Pac. (2d) 293; Emery v. Emery, 122 Mont. 201, 200 Pac. (2d) 251; and others, there is no way for a wife to share in the accumulations of a lifetime of marriage if she lets the husband manage the business and keep the property in his name. And if an over-fond wife permits her husband to deal with her separate property and as a result of such transactions he gets title in his own name, it is presumed to be a gift. That seems to me to be inequitable and unjust, but it is established law.

However, there is nothing that prevents these property rights of the husband and wife from being adjudicated in the divorce case. In many instances it is the proper place to ascertain those rights. In the case at bar the majority cite the requirement of section 9130, R. C. M. 1935, and Pomeroy on Code Remedies (5th Ed.), sec. 336, p. 516.

Section 9130, R. C. M., designates the causes that can be joined. But if two causes of action are improperly joined and no objection is made, the defect is waived. Section 9136, R. C. M. 1935; Binzel v. Viehmann, 111 Mont. 6, 106 Pac. (2d) 187; Frost et al., v. J. B. Long & Co., 66 Mont. 385, 213 Pac. 1107.

The same is true of the majority objection that the several causes of action were intermingled and not severally stated and numbered. "The purpose of the rule is to enable a defendant to raise his defenses to one or more of the causes more clearly. * * * If two or more causes of action are commingled, and the defendant does not raise the question by motion, where that is the remedy afforded, he must be prepared to meet both at the trial, as the defect is not fatal to the causes of action blended, and is

waived if not raised by timely and proper objection.'' 1 Bancroft, Code Pleading, sec. 116, pp. 223, 224.

If the parties feel that their rights are best preserved by settling all their matters in one action and waive their rights to object to misjoinder and the trial court does settle them, this court has no basis for disapproval.

Some of the trial court's decree disposing of the property rights of the parties cannot be sustained, but the divorce decree should be sustained and the cause returned for correction of that part of the judgment that is invalid.