JULIA REED, Plaintiff and Appellant, v. FRED C. REED,
Defendant and Respondent.
No. 9384.
Submitted February 9, 1956. Decided April 5, 1956.
Rehearing denied December 20, 1956.
304 Pac. (2d) 590.

(409)

410

Mr. Horace J. Dwyer, Anaconda, Mr. Ralph J. Anderson, Helena, for appellant.

Mr. J. B. C. Knight, Mr. Wade J. Dahood, Anaconda, Mr. Joseph J. McCaffery, Jr., Butte, for respondent.

Mr. Anderson, Mr. Dahood and Mr. Knight argued orally.

MR. JUSTICE ANDERSON:

The plaintiff and defendant to this action obtained divorces from their immediate former respective spouses and on April 17, 1948, at Las Vegas, Nevada, entered into marriage.

After what could be described as a truly stormy marital relationship, the plaintiff Julia Reed brought this action against the defendant Fred C. Reed and it was alleged that she had been a resident of Montana for more than one year immediately preceding the commencement of this action, and that defendant disregarding his duties as a husband, for more than one year last past, has done all sorts of things contrary to that expected in a marital relationship.

In all respects plaintiff's complaint was broad enough under the statute to grant an absolute divorce provided of course that proof followed. However the complaint contained only prayers for permanent alimony in the amount of $1,000 per month, attorney's fees, injunctive relief and security that she may live separate and apart from the defendant and for such further relief as to the court may seem just and equitable and no specific prayer was made for an absolute divorce.

Defendant's answer to the complaint admitted the marriage, the residence, and then cross-complained whereby he sought an absolute divorce from the plaintiff.

After a lengthy hearing the district judge below entered a decree granting to the plaintiff an absolute divorce along with certain allowances to be paid monthly by the defendant for approximately five years and certain other relief was granted which is of no importance to this appeal. From the judgment and decree the plaintiff appeals. The questions raised by her appeal are as follows:

1. Does the court as a matter of law have the right to grant an absolute divorce in a suit wherein the plaintiff sought separate maintenance only?

2. What is the propriety of a monthly award for approximately five years for the support and maintenance of plaintiff?

3. The propriety of the court in permitting over objections testimony concerning the relationship between the parties hereto prior to their marriage.

There are no minor children, nor any children, involved in the questioned marital status. Thus there is but the disposition to be made of the marital status between the litigants themselves. A study of the evidence produced at the trial proves the seriousness and finality of the marital rupture. A reconciliation would be, as the evidence shows, impossible.

Michigan and Tennessee have by statute granted to the court authority to use its sound discretion where a divorce from bed and board is prayed; the appellate courts in those states have sustained rulings by the lower court wherein absolute divorce was granted when the complaint asked for a divorce from bed and board. Lingner v. Lingner, 165 Tenn. 525, 56 S.W. (2d) 749, and Plantt v. Plantt, 28 Tenn. App. 79, 186 S.W. (2d) 338; Ratcliffe v. Ratcliffe, 308 Mich. 488, 14 N.W. (2d) 127. No such discretion is allowed by the Montana statutes.

However as is stated in 3 Nelson on Divorce, 2nd Ed., section 32.39 pages 409, 410: "Contrary to the rule governing divorce actions in some jurisdictions, that absolute divorce may be decreed though the plaintiff ask only for a divorce from bed and board, if a wife, not desiring a divorce, proceeds for separate maintenance the court may not decree a divorce, but is bound to decree separate maintenance only * * *".

It would be difficult indeed to find better language contained in any of the cases which would be more apropos to the circumstances as they were presented to us in the instant appeal than in the case of Cawley v. Cawley, 59 Utah 80, 202 Pac. 10, 11, where it is said: "While, upon the other hand, the defendant, by an abundance of evidence, proved that the plaintiff, in view of her condition, was guilty of exceedingly harsh conduct and of cruel treatment, causing her much physical pain and much mental anguish which would have entitled her to a divorce, yet, in view that she in her counterclaim did not pray for a divorce, and at the trial frankly conceded, giving

her reasons therefor, that she did not desire to be divorced from the plaintiff, the court was bound to respect her wishes in the matter and limit the relief in her behalf to separate maintenance. While it may be true, as plaintiff's counsel with much vigor contends, that the evidence is replete with facts from which it must be clear to all that the plaintiff and the defendant are mismated and cannot continue their marital relations, and, for that reason, in the long run, it would be better for society, better for the parties, and better for all concerned that they be divorced and their unfortunate misalliance be ended, yet, in view of the fact that the plaintiff is the transgressor and the defendant is compelled to live separate and apart from him without fault on her part, and in view that she declines to be divorced, although entitled to a divorce, she cannot be coerced into assuming a status she declines to enter, namely, that of a divorce. The district court was therefore powerless to grant plaintiff's request, and, for the same reason, we are powerless to do so.''

The plaintiff's action was for separate maintenance and not ██ divorce as is evidenced by her complaint and in her testimony she indicated definitely that she did not desire a divorce and the lower court was in error in forcing the plaintiff to accept a form of relief which she did not seek and which she did not desire.

Section 21-136, R.C.M. 1947, reads as follows: ''Though ██ judgment of divorce is denied, the court may, in its discretion, in an action for divorce, provide for the maintenance of the wife and her children, or any of them, by the husband.'' This statute seems definitely to point out the scope of the courts' authority and nowhere in the Montana Civil Code can there be found any authority wherein the courts are permitted, by statute, to grant a divorce where only separate maintenance is sought. The general rule of statutory construction is applicable, it being that where there is an express mention of certain authority, the mentioning of it implies the exclusion of any other. Compare Stephens v. City of Great Falls, 119 Mont. 368,

175 Pac. (2d) 408; 82 C.J.S., Statutes, section 333, paragraphs 666 to 670; 50 Am. Jur., Statutes, sections 244, 245, 246, paragraphs 238 to 241.

An examination of section 21-103, R.C.M. 1947, discloses that absolute divorces, or separations from bed and board or decrees for separate maintenance, may be granted for certain reasons, but there is nothing in that section which suggests the court may grant relief beyond that which is sought for by the prevailing party.

Respondent contends that the cases of Weil v. Weil, 37 Cal. (2d) 770, 236 Pac. (2d) 159, and Greenwood v. Greenwood, 101 Cal. App. 736, 282, Pac. 433, are persuasive in support of the legal premises that he advances. However in both of those cases the wife consented to amend the prayer of her complaint and thereby consented to a decree being entered for absolute divorce.

Consistent with the overwhelming weight of authority we hold that the district court has no power to grant relief in an action wherein separate maintenance is sought by granting an absolute divorce.

The apparent policy of the legislature in adopting R.C.M. 1947, section 21-136, was to discourage the incautious granting of divorces and in doubtful cases to give the court the authority to grant a separation rather than to destroy the vinculum of the marriage, the reason for this being that a reconciliation of the parties may be accomplished by legally separating them for a time thus permitting their passions and prejudices to subside and for the further and more important reason that the children, if any, resulting from the marriage must come foremost in the court's consideration.

The legislature has imposed the methods recognized under which the bonds of matrimony are consummated and at the same time it has imposed the methods under which those bonds may be terminated. For us to read into the statute something that is not there would be in effect a judicial amendment thereto. Such authority has not been committed to us.

A suit for separate maaintenance is one of ancient origin but unless we can find statutory authority, and we find none, which gives to the courts the power to use their discretion in their disposition of domestic relations, then we must follow the general rules as have been laid down by our predecessors.

Quoting again from Nelson on Divorce, supra, section 32.04, page 368: ''Proceedings for separate maintenance and actions for divorce are directly related and are similar in their nature, in that the marriage relation constitutes the foundation of the action in each case, and the dissolution of the relation extinguishes the subject matter which forms the basis of the action. On the other hand, the object of a divorce action differs from that of a separate maintenance proceeding in that the former is an action to dissolve the marriage relation and extinguish its obligations except in so far as the duty of support is preserved by provisions of the decree requiring payment of alimony, as well as to determine the property rights of the parties and fix the status of any minor child or children of the marriage, while the latter is a proceeding in affirmance of the marriage relation and to enforce its obligations in respect to the support of the wife during the continuance of the marriage. It does not contemplate a termination of the marriage relation, but a continuation thereof.''

The second question can be answered by saying that the evidence [5] ▮▮▮ discloses plaintiff's needs were such that she wished only to restore herself to her station of life as it existed prior to the marriage here in question. Taking into account the defendant's ability to provide and the plaintiff's right to be provided for, we think the district judge was generous with his result. The record discloses that plaintiff was anything but helpful in the pursuits of defendant and, as a consequence of her activity, defendant's business enterprises and his ability to earn were, during the course of the stormy marriage, obviously lessened.

The question regarding the propriety of certain evidence ▮▮ admitted over objection is a frivolous assignment of error.

The judge below admitted such evidence which, if it had been given to a jury, may have well been prejudicial. But here, upon its admission, he said to counsel that its introduction would have no bearing upon the conclusion he reached and quite obviously it did not.

Counsel for defendant Fred Reed when cross-examining asked of and elicited from Julia Reed the information that she did not want an absolute divorce, and both counsel for the defendant and the plaintiff acquiesced in the fact that the action was for separate maintenance.

Much space is given in the dissenting opinion to other matters wholly irrelevant to this appeal. In this connection suffice to say that Julia Reed perfected the appeal and Fred Reed brought to us no cross-assignments of error and hence is in no position to complain, and his counsel does not complain, about the court's action with respect to the insurance policies.

Judgment is reversed and for good cause shown the case is remanded with directions to proceed in accordance with the views herein stated, either upon the record as now made or upon such further evidence as either party may desire to submit.

MR. JUSTICES ANGSTMAN and DAVIS, concur.

MR. CHIEF JUSTICE ADAIR, (dissenting).

This is an appeal by the plaintiff, Julia Reed, from a decree granting her a divorce from the defendant, Fred C. Reed.

It was on October 2, 1946, at the Finlen Hotel in Butte, Montana, that the plaintiff, then Julia Pond, and the defendant Fred C. Reed first met.

At that time Julia was on the stage as a concert singer in light opera and making her home in a rented apartment in Beverly Hills, California, and Fred was a successful retail auto dealer and the president and principal owner of both the Reed Motor Company of Anaconda, Montana, and the North Side Motor Company of Jerome, Idaho.

Julia was then the wife of one Abbott S. Pond by whom

she had two daughters and Fred was the husband of one Frances Reed by whom he had children but not withstanding their respective attachments and obligations Fred immediately fell for Julia and she, presumably, for him.

During the period from October 2, 1946, to the middle of April 1948, Julia and Fred saw much of each other and did considerable traveling together in and about Montana, Utah, Nevada, California and elsewhere. Fred gave Julia money right along and in March 1947 he gave her a car.

In time Julia obtained a divorce from Abbott S. Pond, and, in early April of 1948, Fred's union with Frances Reed was dissolved by a decree of divorce.

No sooner was he freed from his union with Frances than Fred took off, post haste, for Las Vegas, Nevada, where, on April 17, 1948, his marriage to Julia Pond was solemnized. This marriage appears to have been somewhat of a cash and carry proposition for, at the very outset, Fred agreed with Julia that he would pay her a stipulated substantial monthly cash allowance and that in addition thereto he would pay all the monthly bills and accounts for their household and living expenses.

At the start such allowance was $400 per month and this sum Fred regularly paid until there came a time when, because of adverse business conditions and his greatly increased obligations, outlays and expenditures, Fred, in an attempt to make ends meet, found it necessary to cut Julia's cash allowance to $300 per month which sum he regularly paid her each and every month until the month of December 1951, when Julia commenced this suit.

During the time she was married to Fred, Julia continued to keep and maintain her rented apartment in Beverly Hills and each month, as she received her stipulated cash allowance from Fred, she would forward same to a bank in California for deposit in her private checking account which she there carried in the name of "Julia Arlington."

Following his marriage to Julia, Fred bought a new home

located at No. 1614 Tammany, Anaconda, Montana. This home was of the estimated value of $18,000 and Fred placed the title thereto in his name and that of Julia, jointly. Fred completely outfitted this home with wholly new furniture, furnishings and appliances at the estimated cost of $12,000.

As a condition precedent to the dissolution of his first marriage Fred entered into a property settlement with his then wife, Frances, which, inter alia, called for the payment by Fred to Frances of a stipulated sum in monthly installments of $500 each to continue until the amount called for by the settlement agreement was fully paid. The divorce decree thereafter entered required that Fred pay Frances the further sum of $250 per month as permanent alimony. Thus was Fred obligated to pay his first wife, Frances, $750 per month and to pay his second wife, Julia, $300 per month making a total cash outlay for such items of $1,050 each and every month.

In the fall of 1951, and as a result of his matrimonial entanglements and obligations, Fred found himself in dire financial straits, with his credit greatly impaired and numerous creditors pressing him from all sides. He testified: "I was embarrassed at the demands for the payment of our bills, and I wanted to put her [Julia] on a cash basis in an effort to discontinue the $300 payment because of the mess * * * to get her on a cash basis and cut down on some of the indebtedness, but she would pay one bill and then make up for it with other bills, but I couldn't keep up with her in three states and I never knew where these bills were coming from—I tried to put her on a cash basis, but it was impossible because the bills kept coming in from all over."

In the latter part of October 1951 such financial involvements and difficulties precipitated a heated quarrel following which Julia retained counsel preparatory to instituting this suit. On November 7, 1951, being one week after Fred had paid Julia her November allowance of $300, Julia's counsel ordered Fred out of the home and that he give Julia additional money and, in compliance with such orders Fred, on

November 7, handed Julia the further sum of $200 in cash and removed himself from the family home whereupon, on December 22, 1951, Julia commenced in the district court of Deer Lodge County, Montana, this suit.

*Restraining Order of December 22, 1951.* On the day of the filing of the complaint the district court issued ex parte, and caused to be served, its order requiring the defendant to show cause, on a day certain, why he should not be required, during the pendency of the action, to pay Julia the sum of $1,000 to employ counsel to prosecute her action, plus the sum of $1,000 per month for her support and maintenance, plus $300 for costs and expenses of her suit and further requiring the defendant husband to show cause "why he should not be enjoined and restrained from selling, transferring, assigning, or otherwise disposing of, and from mortgaging, hypothecating or otherwise encumbering or disposing of any money or property of whatsoever kind or nature belonging to the Plaintiff and/or Defendant, and why he should not be restrained and enjoined from residing in or visiting the residence now occupied by said Plaintiff, and from visiting said residence until the further order of this Court."

The order further required that until the court's further order the defendant and his attorneys, agents and servants "desist and refrain from transferring, assigning or otherwise disposing of *any property* belonging to the Plaintiff and/or the Defendant" and ordered the defendant husband "to remain out of the * * * residence occupied by the Plaintiff, and to desist and refrain from visiting the said residence, and from molesting or interfering with said Plaintiff."

*Order of January 16, 1952.* On January 16, 1952, following a hearing had on the above order to show cause of December 22, 1951, the said district court made and caused to be entered an order that the defendant: (1) Pay to the clerk of court $450 per month for the plaintiff's support and maintenance until further order of the court; (2) pay all plaintiff's household expenses including house payments, taxes, light, electricity,

heat, etc.; (3) pay to the clerk of court $1,000 for fees for plaintiff's attorneys; (4) pay for first class transportation for three witnesses from their residences in the State of Idaho, to and from the City of Anaconda, Montana; (5) pay for the maintenance of said witnesses including the cost of their meals in an appropriate place, such as the Montana Hotel, during the time necessarily spent by them in Anaconda; and (6) that until further order of the court the defendant husband "shall continue to make the payments hereinabove ordered." The trial court's grant of power to make this order came not from the second sentence of section 21-137, R.C.M. 1947, applicable only to a pending action for separate maintenance when "the husband wilfully deserts the wife" but, under the allegations of plaintiff's complaint, the power must and it did come from the first sentence of section 21-137, applicable to a pending "action for divorce".

*Complaint.* The plaintiff Julia Reed's complaint alleges:

"Now comes the above named Plaintiff, complains of the Defendant, and for cause of action, alleges: I. That the plaintiff is and has been, a bona fide resident of the State of Montana for more than one year immediately preceding the commencement of this action."

In substance the complaint further alleges, *inter alia:* II. That plaintiff and defendant intermarried in the State of Nevada on April 17, 1948, and ever since have been husband and wife; III. That no children were born of the marriage; IV. That disregarding his duties as a husband the defendant has been guilty of extreme cruelty toward plaintiff, in this: That for more than a year last past defendant has been guilty of leaving their home upon numerous occasions without giving plaintiff any explanation as to his whereabouts and his companions; that plaintiff has been verbally informed and believes defendant, for several months has been keeping company with other women, namely Helen Doe, Del Doe and Jane Doe; that upon numerous occasions, the exact dates being unknown, defendant has threatened to inflict violence and serious bodily

injuries upon plaintiff; that on or about October 21, 1951, in Deer Lodge County, Montana, the defendant struck plaintiff with his fist and knocked her from the seat to the floor of his automobile inflicting upon plaintiff severe bruises and injuries dangerous to her life and health; and V. that at no time has plaintiff condoned defendant's treatment of her or any single act of cruelty inflicted upon her by defendant.

The allegations of the complaint are sufficient to state a cause of action for divorce grounded on extreme cruelty under the provisions of R.C.M. 1947, section 21-134, 21-103 subdivision 3, and 21-106, and if proven, would entitle the plaintiff to a decree of divorce.

The complaint further alleges, *inter alia:* VI. That defendant is an able bodied man and a controlling stockholder of the Reed Motor Company at Anaconda, Montana, and in the North Side Motor Company at Jerome, Idaho, and has an annual income in excess of $20,000; that plaintiff has not sufficient means with which to pay for attorney's fees, costs of this suit and for her maintenance and support; that "Defendant provided Plaintiff with most of the necessaries of life, and in addition thereto, gave said Plaintiff the sum of Three Hundred Dollars ($300.00) per month for her personal expenses; that during the latter part of October or the early part of November 1951, and in view of their separation, said Defendant gave Plaintiff the sum of Five Hundred Dollars ($500.00) for her personal expenses up to December 1, 1951''; that a reasonable sum to be allowed plaintiff for the support of herself is $1,000 per month; for her attorney's fees, $1,000, and for court costs and expenses of procuring witnesses, including traveling expenses for certain witnesses from Jerome and Twin Falls, Idaho, $300; "VII. That * * * defendant has expressed the intention of disposing of certain of the said property for the purpose of defeating the rights and claims thereto of plaintiff * * * that said Defendant * * * intends to, and will, unless restrained from the order of said Court * * * carry out such intention and threat and * * * that by reason of the facts

\* \* \* Defendant, his representatives, agents, bankers, attorneys and servants, should be enjoined and restrained from selling, transferring, conveying, assigning, or otherwise encumbering all or any part of said property or removing any of the same from the jurisdiction of this Court.''

The prayer is:

''1. That she may live separate and apart from said Defendant;

''2. That permanent alimony in the sum of One Thousand Dollars ($1,000.00) per month be paid and secured to her for the separate maintenance of herself:

''3. That an Order Pendente Lite be granted \* \* \* enjoining and restraining the said Defendant \* \* \* and his representatives, agents, bankers, attorneys and servants from selling, transferring, conveying, assigning or \* \* \*. encumbering or removing from the jurisdiction \* \* \* all or any part of said property;

''4. That this Court make an order requiring said Defendant \* \* \* to give reasonable security for providing maintenance for the support of Plaintiff or for making any payments required \* \* \*

''5. That \* \* \* Defendant be required to pay as counsel fees in behalf of \* \* \* Plaintiff \* \* \* One Thousand Dollars \* \* \* and the further sum of Three Hundred Dollars \* \* \* as costs of maintaining the \* \* \* action and expenses for witnesses \* \* \* and

''6. That Plaintiff have such further relief as to the Court may seem just and equitable.''

*Answer.* The defendant filed an answer and cross complaint to plaintiff's above complaint. Defendant's answer admits the averments of paragraphs designated I, II and III of the complaint and as to the averments of paragraph VI thereof admits that defendant has an interest in the Reed Motor Company and the North Side Motor Company ''and that prior to the seperation of the Plaintiff and Defendant, he did pay to the Plaintiff the sum of Three Hundred Dollars ($300.00) per month

to aid her in paying up obligations that she had contracted" but denies each and all the other allegations of said paragraph VI, supra; denies the allegations of paragraph VII and denies generally each and all the allegations of the plaintiff's complaint not specifically admitted.

*Cross Complaint.* The defendant husband's cross complaint alleges:

"For a Cross-Complaint, the above named Defendant complains of Plaintiff, and for cause of action alleges:

"1. That the Plaintiff is and has been a bona fide resident of the State of Montana for more than one (1) year immediately preceding the commencement of this action."

In substance the cross complaint further alleges, *inter alia:* 2. That plaintiff and defendant intermarried in the State of Nevada on April 17, 1948, and ever since have been wife and husband; 3. that no children were born of the marriage; 4. that in total disregard of her marital vows and duties as a wife the plaintiff wife has been guilty of extreme cruelty toward and treatment toward defendant in this: That plaintiff has inflicted grievous mental suffering upon defendant by a course of conduct toward and treatment of defendant existing and persisted in for a period of one year before the commencement of this action which justly and reasonably is of such a nature and character as to destroy the peace of mind and happiness of defendant and entirely defeat the proper and legitimate objects of the marriage, and to render a continuance of the married relation between the parties perpetually unreasonable and intolerable to defendant; 5. that at all times defendant has conducted himself toward plaintiff in a true, dutiful and husbandly manner and has even been regardful of his marital relations and has never, at any time, given plaintiff any excuse or provocation to treat him in any manner than in kindness; that plaitiff's course of treatment within the year preceding the filing of this action has been such as was calculated to and it did inflict upon defendant mental pain, suffering, anguish and injury dangerous to the life of the defendant; that at no

time has defendant condoned plaintiff's treatment of him or any single act of cruelty inflicted upon him by plaintiff.

The allegations of the cross complaint are sufficient to state a cause of action for divorce based upon extreme cruelty under the provisions of R.C.M. 1947, sections 93-3415, 21-134, 21-103, subdivision 3, and 21-106, and, if proven, would entitle the defendant husband to a decree of divorce.

The prayer to the answer and cross complaint is that plaintiff take nothing by her action and that defendant have judgment against plaintiff: "1. That the bonds of matrimony * * * between the Defendant and Plaintiff be dissolved, and that they and each of them be freed from said marriage, and that the Defendant be restored to the status of a single person. 2. And for such other and further relief as may be just and equitable."

*Reply.* By her reply to the defendant's cross complaint the plaintiff admits the allegations of paragraphs designed 1, 2 and 3 of the cross complaint and denies the allegations in paragraphs 4 and 5 thereof.

*The Issues.* The issues so presented by the complaint, the answer, the cross complaint and plaintiff's reply to the cross complaint were tried in May and in September 1952 to the district judge sitting without a jury and a large amount of evidence was introduced, much of which is most conflicting and confusing.

On November 2, 1952, the trial judge made and filed nine separately numbered written findings of fact and two conclusions of law based on such findings.

No exceptions were taken as to any of the first six findings of fact but plaintiff filed timely exceptions to the trial court's findings numbered VII, VIII and IX and to the two conclusions of law together with plaintiff's request for additional findings and conclusions to be based on her exceptions. The matter was heard on December 5, 1952, and on June 4, 1953, the trial court amended its original findings of fact and conclusions of law to which amended findings and conclusions neither party excepted.

*Findings of Fact.* The court's fourth, fifth, seventh and ninth findings of fact so made recite:

"IV. That prior to the marriage of Plaintiff and Defendant, each of the parties had been previously married and divorced, the Plaintiff twice and the Defendant once; that Plaintiff is the mother of four children, the issue of her former marriages, and the Defendant is the father of two children, the issue of his former marriage; that all of said children have attained their majorities.

"V. That the children of the parties are in the background of some of the difficulties that occurred between the parties, and this factor, combined with difficulties arising out of financial matters, resulted in that for more than one year immediately preceding the commencement of this action, the Defendant inflicted grievous mental suffering upon the Plaintiff, by a course of conduct toward, and treatment of the Plaintiff, which justly and reasonably was of such a nature and a character as to destroy the peace of mind and happiness of the Plaintiff, and to entirely defeat the proper and legitimate objects of marriage, and to render the continuance of the marriage relation between the Plaintiff and the Defendant perpetually unreasonable and intolerable to the Plaintiff; that the allegations of said conduct contained in Plaintiff's Complaint are true, and the Plaintiff is entitled to a Decree of Divorce dissolving the marriage relationship existing between her and the Defendant. * * *

"VII. That the Plaintiff, prior to her marriage to Defendant, was a professional singer, and is now without means to maintain and support herself; that a reasonable period for her to be maintained by the Defendant, and for her to adjust herself and again be in a position to maintain and support herself, is five years, and a reasonable amount for her maintenance and support during such period is the sum of $250.00 per month. * * *

"IX. That the pleadings of the Plaintiff, and evidence introduced by both parties, establish that the Plaintiff is entitled

to a divorce, and that the marriage of the parties be dissolved; that the Defendant is not entitled to a Decree of Divorce as prayed for in his Cross-Complaint.''

*Final Decree.* On June 6, 1953, final decree was entered (1) dissolving the marriage; (2) awarding the plaintiff alimony of $250 per month for a period of fifty-three months; (3) requiring that such monthly payments be made to the clerk of court; (4) requiring that defendant secure such payments for the benefit of the plaintiff, by depositing with the clerk of court three enumerated policies of insurance on defendant's life with endorsements thereon naming the plaintiff as the beneficiary thereof and (5) requiring that on or before the 10th day of each month the defendant shall file with the clerk of court evidence substantiating the fact that the monthly premiums due upon the said policies have been paid.

On December 5, 1953, the plaintiff wife served and filed her notice of appeal from the above decree and judgment. The plaintiff deems herself aggrieved by the decree entered herein because: (1) It allows her $250 monthly alimony instead of the $1,000 sought; (2) it limits her alimony award to a fifty-three month period instead of for the remainder of her life and (3) it grants a divorce terminating the marriage relation rather than a decree of separate maintenance continuing the marriage status in name only, but relieving the wife of her obligation to cohabit with her husband.

*Contempt Citation and Conviction.* On January 6, 1954, the plaintiff Julia Reed made and filed in the district court her motion that defendant be cited and punished for contempt of court which motion she supported by her accusatory affidavit wherein she deposed that as of that date the defendant was delinquent in the payments ordered by the trial court in the sum of $3,275 plus interest at the rate of 6% per annum. On plaintiff's motion and charges so made the defendant was cited and, on January 27, 1954, he was adjudged in contempt of the trial court and the sheriff of Deer Lodge County was, by such adjudication, ordered to take defendant into custody and to

"hold him in custody in the county jail of Deer Lodge County until he purges himself of contempt of this court."

Thereafter, by stipulation of counsel for the respective parties entered into on April 2, 1954, it was agreed that in order to purge the defendant Fred C. Reed of contempt, the defendant would that day pay to plaintiff's attorneys $1,000 of which $500 would go to plaintiff,—$300 to the court stenographer to apply on plaintiff's transcript on appeal and $200 to plaintiff's attorneys and that on April 11, 1954, defendant would pay the additional sum of $750 and continue to pay on the 11th day of each month thereafter the sum of $750 until the plaintiff is paid her alimony up to date, and the court stenographer is paid on the transcript on appeal in full, and the amount due plaintiff's attorneys is paid in full and thereafter promptly on the 11th day of each month, the defendant will pay the sum of $250 as provided in the decree of divorce from which the appeal is being taken.

The transcript on the appeal consists of four typewritten volumes containing 913 pages and fourteen separate specifications of error are urged.

The principal contention is that, under the pleadings, the trial court was lacking in discretion, authority and jurisdiction to render or enter its decree granting plaintiff a divorce.

There was no divorce or separate maintenance at common law. 27 C.J.S., Divorce section 69, notes 12-15, page 630.

Such proceedings are *sui generis.* Caldwell v. Caldwell, 298 N.Y. 146, 81 N.E. (2d) 60, 64; Shively v. Shively, 88 Ohio App. 7, 95 N.E. (2d) 276, 282; Todd v. Policemen's & Firemen's Pension Fund, 14 N.J. Super. 508, 82 At. (2d) 233, 235; Dunnington v. Dunnington, 324 Mass. 610, 87 N.E. (2d) 847; Reeve v. Reeve, Mo. App., 160 S.W. (2d) 804, 808; Wright v. Wright, 350 Mo. 325, 165 S.W. (2d) 870, 873; State ex rel. Rodgers v. White, 239 Mo. App. 838, 201 S.W. (2d) 781, 782; Finnell v. Finnell, 59 Idaho 148, 81 pages (2d) 401, 402; State ex rel. Couplin v. Hostetter, 344 Mo. 770, 129, S.W. (2d) 1; Nield v. Nield, 126 W. Va. 430, 28 S.E. (2d) 825, 826; McCotter

v. Carle, 149 Va. 584, 140 S.E. 670, 673; Troutt v. Troutt, 35 Tenn. App. 617, 250 S.W. (2d) 372, 374.

As was said by the Court of Appeals of New York in Caldwell v. Caldwell, supra [298 N.Y. 146, 81 N.E. (2d) 64]: ''In matrimonial actions, the courts of this State have only such powers as are conferred upon them by statute. The English law relating to such actions constituted a part of the ecclesiastical and not of the common law of that country and has never been adopted by this State. [Citing cases.] Hence, the power of the Supreme Court to grant a judgment of seperation and of support for the wife and support and maintenance for the child is derived solely from the statutory law of this State.''

It is well established that the power of courts in matrimonial matters are to be determined entirely upon the terms of the statutes conferring jurisdiction. Emery v. Emery, 122 Mont. 201, 223, 200, pages (2d) 251, 264. Also see Rumping v. Rumping, 36 Mont. 39, 91 page 1057, 12 L.R.A., N.S., 1197; Sell v. Sell, 58 Mont. 329, 193 pages 561, 562; Shaw v. Shaw, 122 Mont. 593, 208 pages (2d) 514, 525.

''This is so because of the fact that, at the time our forefathers brought with them the common law of England, neither courts of law or equity had jurisdiction in such matters; they being handled exclusively by the ecclesiastical courts. * * * The first legislative assembly of the territory, therefore, provided for actions for divorce, on grounds which are now recognized as applying only to annulment proceedings, as well as those for divorce proper, and provided for the granting of alimony, both permanent and temporary, in all such actions.'' State ex rel. Wooten v. District Court, 57 Mont. 517, at page 522, 189, chapter 233, at pages 234, 235, 9 A.L.R. 1212.

By voluntarily coming into the district court with her marital troubles and by filing therein her complaint invoking the exercise of that court's power to hear her complaint and render her her rights under the law of this state, the plaintiff submitted herself and her suit to the ultimate determination of such

court for all purposes within the scope of her pleadings and thereby the trial court acquired jurisdiction over the plaintiff and her cause. 21 C.J.S., Courts, section 82, notes 3 and 4, page 122, section 83, subd. a, paragraph 122, 123.

*Pleading.* The allegations of the opening paragraph of plaintiff's complaint were designed and placed therein to meet and comply with the requirements of section 21-134 of the Codes governing *all actions for divorce.* These allegations serve no other purpose. They fully meet such pleading requirement of the Codes and at the very outset brand plaintiff's suit as an action for divorce wherein such allegations are absolutely necessary and not as a separate maintenance proceeding wherein such allegations are neither required nor proper.

Likewise the first paragraph of defendant's cross complaint was employed for the specific purpose of complying with the requirements of section 21-134, supra, applicable only to actions for divorce and it brands defendant's pleading for affirmative relief as an action for divorce.

The nature of the wife's suit and the judicial relief that may be given therein are to be determined from the *allegations* and statements of ultimate facts set forth in her complaint and not from the naming or labelling of such pleading.

Under "modern practice, a plaintiff is not required to * * * give his cause of action a name, and the labeling of a complaint to characterize it has been held unnecessary and improper * * *.

"* * * and, under a code *the character of the pleading and the right to recovery are to be determined from the facts alleged, regardless of the name given to the pleading.* So, if the facts stated in a pleading give a cause of action, the pleading is sufficient, even though it is inaptly named." Emphasis supplied. 71 C.J.S., Pleading, section 69, notes 46, 47, 50 and 51, chapters 183, 184.

The vital question is whether *the facts alleged* are such as to justify judicial relief. Equitable Holding Co. v. Equitable Building & Loan Ass'n, 202 Minn. 529, 279 N.W. 736, 742.

R.C.M. 1947, section 21-134, provides: "A divorce must not

430

be granted unless the plaintiff has been a resident of the state for one year next preceding the commencement of the action.''

R.C.M. 1947, section 21-135, provides: ''No divorce can be granted upon the default of the defendant alone, but the cause must be heard in open court, and the court must require proof of all the facts alleged.''

The above provisions of the Code are jurisdictional in actions for divorce. By reason thereof to prevail in an action for divorce, it is essential that the plaintiff both *allege* in her complaint and *prove* by the evidence introduced at the trial that plaintiff has been a resident of Montana for at least one year next preceding the commencement of the action.

Proceedings for the annulment of a marriage or for separate maintenance are not subject to the above quoted residence requirements which govern actions for divorce. In the case of a wife suing for an annulment of a marriage or for separate maintenance her residence is immaterial. It need not be alleged. It need not be proved. Such has even been the law, procdure and practice in this jurisdiction.

It is a general rule of pleading that the character of a pleading is to be determined, not from the title given it, but from its allegations. In all cases the court considers the pleading according to its legal effect and determines its character without reference to the title it bears.

The prayer is no part of the pleading or cause of action stated. It can in no way affect the sufficiency of the matter pleaded. It can neither enlarge nor limit the relief sought by the allegations of the complaint. Donovan v. McDevitt, 36 Mont. 61, 65, 92 page 49; Rohr v. Stanton, 78 Mont. 494, 502, 254 page 869; Blackwelder v. Fergus Motor Co., 80 Mont. 374, 260 page 734; Murray v. Creese, 80 Mont. 453, 459, 260 page 1051; First National Bank v. Conner, 85 Mont 229, 278 page 143.

It is of little consequence where, as here, issues are joined, whether there is any prayer at all. In re Chope, 112 Cal. 630, 44 page 1066; Hoffman v. Pacific Coast Const. Co., 37 Cal. App. 125, 173 page 776; Burnaham-Hanna-Munger Dry Goods Co.

v. Hill, 17 N.M. 347, 128 page 62; Scott v. Vulcan Iron Works Co., 31 Okl. 334, 122 page 186; Rutenic v. Hamakar, 40 Or. 444, 67 page 196; Donovan v. McDevitt, supra.

In short the sufficiency of a complaint is measured by the averments of fact it contains and not by the prayer. Samuels v. Singer, 1 Cal. App. (2d) 545, 36 page (2d) 1098, 37 page (2d) 1050; State ex rel. Coan v. Plaza Equity Elevator Co., 65 N.D. 658, 261 N.W. 46.

Pleadings are the judicial means to invest the court with jurisdiction. Every complaint should be founded on some definite legal theory and it must allege the facts upon which such theory is based. This rule is essential to the foundation of issues and to the intelligent and just trial of causes.

In St. John v. Taintor, 56 Mont. 204, 209, 182 page 129, 131, this court said: " 'Pleadings and a distinct issue are essential in every system of jurisprudence, and there can be no orderly administration of justice without them. If a party can allege one cause of action and then recover upon another, his complaint will serve no useful purpose, but rather to ensnare and mislead his adversary.' Southwick v. First Nat. Bank, 84 N.Y. 420; Romeyn v. Sickles, 108 N.Y. 650, 15 N.E. 698; 2 Thompson on Trials, sections 2251, 2252.''

That plaintiff's counsel were thoroughly familiar with the above rules of pleading is evidenced by the care and caution with which they approached the trial of this cause, for at the very outset and prior to the calling of their first witness, counsel first tested the trial judge as to his familiarity with the pleadings and issues presented thereby.

The record shows the following proceedings at the opening of the trial, viz.:

"Mr. Meyer: I assume that your honor is familiar with the pleadings in this matter?

"The Court: I am.

"Mr. Meyer: You don't insist on these being read now, Mr. Knight?

"Mr. Knight: No.

432

"The Court: You may proceed.

"Mr. Meyer: We will call Mrs. Reed. (Julia Reed, the Plaintiff herein, was called to the witness stand in her own behalf, and, she being first duly sworn, gave testimony as follows.)

"Q. Will you state your name, please?

"A. Julia Reed.

"Q. You are the Plaintiff in this action? A. Yes.

"Q. And where do you live? A. 1614 Tammany.

"Q. In what city? A. Anaconda.

"Q. How long have you lived in Montana? A. Well, ever since we have been married, for about four years—that's here and down in Idaho.

"Q. Your residence in Montana has been for more than one year prior to the time this suit was started? A. Yes.

"Q. What, if any, relation are you to Fred C. Reed, the Defendant in this action? A. I am his wife.

"Q. When and where were you married? A. We were married in Las Vegas on April 17, 1948.

"Q. And subsequent to your marriage you lived together, did you? A. Yes we did."

*Proof.* Not only did plaintiff properly *plead* the essential ultimate facts as is prescribed by section 21-134, supra, but at the very start of the trial she was the first witness to take the stand and, in her opening testimony, she supplied the *proof* that supported the allegations of the first paragraph of her complaint and also those of the first paragraph of defendant's cross complaint in compliance with the requirements of section 21-135, supra.

The averments properly pleaded in plaintiff's complaint and in defendant's cross complaint and the proof introduced at the trial by each of the parties are clearly sufficient to warrant the trial court in granting either or both parties the relief to which they may be entitled under their respective pleadings and proof. Merk v. Bowery Min. Co., 31 Mont. 298, 308, 78 page 519.

In Munroe v. Munroe, Wash. 1955, 287 chapter (2d) 482, at page 483, it is said: "When the parties were divorced on December 18, 1950, *each* was granted a divorce *from the other.*"

As was said in Thompson v. Thompson, Cal, App. (2d) 1955, 288 chapter (2d) 932, at page 933, "Under the circumstances, it was for the trial court to determine whether or not either or both of the parties should be granted a divorce. De Burgh v. De Burgh, 39 Cal. (2d) 858, 873, 250 chapter (2d) 598; Phillips v. Phillips, 41 Cal. (2d) 869, 877, 264 chapter (2d) 926; Mueller v. Mueller, 44 Cal. (2d) 527, 282 chapter (2d) 869; Gilmore v. Gilmore, 45 Cal. (2d) [142], 287 chapter (2d) 769."

*Priority and Preference.* At the second wife Julia's instance and despite the evidence before it the trial court's decree if sustained would award Julia security and preference for the collection of her alimony award not enjoyed by Frances, defendant's first spouse.

At the trial of the action the plaintiff, on her cross examination, testified she believed it was on October 2, 1946, that she and defendant first met and "he always thought that it was such a wonderful thing that I came into his life, and he told me that, and I thought that was very devine, if you know what I mean." When asked if that condition continued from 1946 to 1948 the plaintiff testified:

"Yes, I waited many years for him to get his divorce and he told me that it was started and I believed him, and I had great faith in his integrity, and in my love and in his love, and I thought it was a very wonderful and very devine thing—he was so very good and kind until the change came in him.

"Q. And you knew at that time that he was a married man, did you not? A. I knew that he was separated from his wife and that he was contemplating a divorce—he told me that he was, if that has any bearing on the case.

"Q. Then you knew he was married? A. Yes.

"Q. And you at the same time were married when you met him? A. Yes, but I had been separated from my husband for

10 years—I didn't know where he was and didn't know that I would ever see him again—I came up with the hopes of finding him in Montana * * *

"Q. That was your reason for being in Montana at the time you met Mr. Reed? A. Yes.

"Q. Did you get a divorce from Mr. Pond here in the State of Montana? A. The divorce was started rather placidly and peacefully. He brought his attorney from New York and I had an attorney here, and we went into our difficulties and very nicely ironed them out, and it was quite suitable and satisfactory to both of us.

"Q. You had no trouble? A. No.

"Q. And that was when you met Mr. Reed in Butte? A. Yes.

"Q. At the time of these other negotiations? A. Yes.

"Q. When was that? A. That was during that time—I met him on the 2nd of October."

As before stated the decree entered in early April 1948 dissolving Fred's union with his first spouse, Frances, obligated him to pay Frances $250 per month as permanent alimony and the settlement agreement obligated him to pay Frances the further sum of $500 each month until the amount called for by such settlement agreement was fully paid so that on April 17, 1948, when Fred and Julia were wed, Julia knew of such obligations which Fred would be required to meet and discharge each and every month. In the light of these facts Julia could not reasonably expect that her more recent union with Fred would in any wise, relieve him of his duty, under the decree and settlement agreement, to pay Frances the monthly installments as they became due, nor could Julia reasonably expect that her claim upon Fred for support should have priority over that of Frances or that the courts of this state would seize and impound all of Fred's property for plaintiff's benefit and security, thereby utterly depriving Fred of the means and ability to meet his prior incurred obligations to Frances.

However the trial court found, ordered and adjudged that

defendant secure the monthly alimony payments for the benefit of defendant by depositing with the clerk of the district court three enumerated policies on defendant's life with endorsements thereon naming plaintiff as the beneficiary thereof and assigning and providing that plaintiff's *interest* in the policies be enforceable to the extent of all installments of alimony remaining unpaid in the event of defendant's death and forbidding the offering or accepting of the policies as security for any loans to the defendant insured during the period of time in which they are hypothecated as security for the monthly alimony payments and further adjudging that on or before the 11th day of each month the defendant shall file with the clerk of the district court evidence substantiating the fact that the monthly premiums due upon said three policies have been paid, the policies of life insurance so enumerated being: United States of America, Government Life Insurance, Policy No. k 712 932, in the amount of $10,000; Prudential Insurance Company of America, Policy No. 767, in the amount of $2,000 and Prudential Insurance Company of America, Policy No. 2163, in the amount of $5,000.

*Federal Statute—Public Policy.* The power and jurisdiction of the state district court to subject to legal process the defendant's United States War Risk Life Insurance policy and the proceeds to be derived therefrom involves the public policy of the nation as declared in World War Veterans' Act of 1924, 43 Stat. 607, as amended, 38 U.S.C.A. section 421 et seq., which makes non-assignability and exemption from execution and from the claims of creditors attributes of the insurance granted thereunder. 43 Stat. chapters 607, 613, section 22. Tompkins v. Tompkins, 132 N.J.L. 217, 38 A (2d) 890; Yake v. Yake, 170 Md. 75, 183 A. 555; Robertson v. McSpadden, D.C., 46 F. (2d) 702; Von Der Lippi-Lipski v. United States, 55 App. D.C. 202, 4 F. (2d) 168. Compare Lewis v. United States, 3 Cir., 56 F. (2d) 563; White v. United States, 270 U.S. 175, 46 S.Ct. 274, 70 L.Ed. 530; Christensen v. Christensen, D. C., 14 F. (2d) 475.

436

In Kaufman v. Kaufman, 93 Cal. App. (2d) 808, 210 chapter (2d) 29, at pages 31-33, the court said:

"War Risk Insurance is a contract made in pursuance of Federal Statute and must be construed with reference to such statute, the regulations promulgated thereunder, and the decisions applicable thereto, rather than by laws and decisions governing private companies. Sternfield v. United States, D.C., 32 F. (2d) 789, 790. The insurance contract is solely between the Government and the insured and the only relations of contract are between the Government and him. White v. United States et al., 270 U.S. 175, 180, 46 S.Ct. 274, 70 L.Ed. 530; Barton v. United States, D.C., 75 F. Supp. 703, 704. In the latter case, 75 F. Supp. at page 705, it was held that the National Life Insurance Act of 1940, 38 U.S.C.A. sections 801-818, is a constitutional exercise of the powers granted to Congress, citing U.S. Constitution Art. I, section 8, clause 1, 13, and as such is the supreme law of the land, if Congress so willed. Id., Art. 6, clause 2. In Mayo v. United States, 319 U.S., 441, 445, 63, S. Ct. 1137, 1139, 87 L. Ed. 1504, 147 A.L.R. 761, it was held that: 'Since the United States is a government of delegated powers, none of which may be exercised throughout the Nation by any one state, it is necessary for uniformity that the laws of the United States be dominant over those of any state. Such dominancy is required also to avoid a breakdown of administration through possible conflicts arising from inconsistent requirements. The supremacy clause of the Constitution states this essential principle. Article VI. A corollary to this principle is that the activities of the Federal Government are free from regulation by any state. No other adjustment of competing enactments or legal principles is possible.' * * *

"We conclude that the property settlement agreement was an assignment of the proceeds of the policy in question, Chilwell v. Chilwell, 40 Cal. App. (2d) 550, 553, 105 chapter (2d) 122; that such an assignment is prohibited by the terms of the Federal Statute, section 454a [38 U.S.C.A.], supra, and is therefore not enforceable against the defendant beneficiary. * * *

"The provision in section 454a that the payments and benefits due or to become due are exempt from taxation and the claims of creditors, and are not subject to legal or equitable process indicates that Congress intended to control the title to such payments and benefits both before and after payment. This control and the provisions of the section have been recognized and enforced. Barton v. United States, D.C., 75 F. Supp. 703, 705; Carrier v. Bryant, 306 U.S. 545, 548, 59 S. Ct. 707, 83 L. Ed. 976."

In Barton v. United States, cited supra, it is said [75 F. Supp. 705] :

"Federal control of title to the proceeds of service insurance, both before and after payment by the Government, has been consistently recognized and enforced. * * *

"It is settled that 'the authority of state laws or their administration may not interfere with the carrying out of a national purpose.' (James Stewart & Co. v. Sadrakula, supra, 309 U.S. [94] at page 103, 60 S. Ct. [431] at page 436 [84 L. Ed. 596].)"

In Tompkins v. Tompkins, 132 N.J.L. 217, 38 A. (2d) 890, 891, 892, it is said:

"As noted, 'payments of benefits,' due or to become due, are nonassignable and beyond the reach of creditors and legal or equitable process, either before or after receipt by the beneficiary * * *

"These provisions forbid the assignment of the policy by the insured and, as well, the curtailment or surrender, contractual or otherwise, of his right to change the beneficiary. The policy of the statute in this regard is to afford a measure of economic security for servicemen and their dependents. Its general design is to provide 'a system for the relief' of disabled veterans and the dependents of veterans who died as a result of disability suffered in military service. 38 U.S.C.A. section 422. * * * It issues 'against the death or total permanent disability' of the insured. Ibid, section 511. * * * The act has 'far-reaching national plan and purposes.' United States v. Patryas, 303

U.S. 341, 58 S. Ct. 551, 553, 82 L. Ed. 883. Insurance is provided that would otherwise be unobtainable in numerous individual cases, and at a rate devoid of the profit element. It issues 'without regard to the health of applicants' (United States v. Patryas, supra); and thus there is accorded substantial recognition for service in the military and naval forces by means that will also conduce to the essential public interest. The benefits of the statute are secured against improvidence and diversion from their basic purpose of support and maintenance in time of urgent need. And the act is to be liberally construed in favor of its beneficiaries and the public policy thereby served.''

Under the federal statutes the state district court was denied the right, authority and jurisdiction to order, adjudge or decree the involuntary endorsement, assignment, seizure and impounding of defendant's United States War Risk Life Insurance policy and the trial court's amended finding of fact No. I, its amended conclusion of law No. III and its final decree attempting to subject such United States Government policy to the legal process of the trial court are void as violative of the cited federal statutes.

The two Prudential Insurance Company policies issued on defendant's life were personal property. Title thereto was in the defendant husband. They were his property and not that of plaintiff.

In Emery v. Emery, 122 Mont. 201, 224, 200 Pac. (2d), 264, this court said: ''Montana has no community property law and the statutes of this state have conferred no power upon the court in an action for divorce to divest the title of the husband to specific real or personal property and to adjudge or order an involuntary assignment or transfer thereof to the wife.'' To like effect see Thrift v. Thrift, 54 Mont. 463, 171 Pac. 272; Rufenach v. Rufenach, 120 Mont. 351, 185 Pac. (2d) 293; Shaw v. Shaw, 122 Mont. 593, 611, 613, 208 Pac. (2d) 514. As to the rule in proceedings for separate maintenance see Decker v.

Decker, 56 Mont. 338, 346, 185 Pac. 168, 170, and Boggs v. Boggs, 119 Mont. 540, 177 Pac. (2d) 869, 872.

The allegations of plaintiff's complaint show her action to be a suit for divorce. Likewise the allegations of defendant's cross complaint state a cause of action for divorce. Thus the trial judge definitely had before him two separate causes of action for divorce and sufficient evidence, if believed, and in the exercise of a sound discretion, to grant a divorce to either or both parties. The personal desires of either the wife or the husband as to the relief that was to be decreed were of but little moment for the judgment to be given was for the trial judge to determine irrespective of whether it should meet with the unqualified approval of either party.

In Ratcliffe v. Ratcliffe, 308 Mich. 488, 14 N.W. (2d) 127, 128, the court observed that courts are not concerned with the personal desire of parties to divorce actions and whether or not a divorce should be from bed and board or absolute must be determined in the light of the public policy of the state and the best interests of the parties and held that, ''The character of the decree entered in such matters 'rests in the sound discretion of the court.' Sullivan v. Sullivan, 112 Mich. 674, 71 N.W. 487.''

*Fair Trial Law.* Section 1 of Chapter 1, Laws of Second Extraordinary Session of 1903, commonly known as a Fair Trial Law, amended section 21 of the Code of Civil Procedure of 1895 by adding thereto a concluding sentence (now the concluding sentence of R.C.M. 1947, section 93-216) which provides: ''In equity cases, and in matters and proceedings of an equitable nature, the supreme court shall review all questions of fact arising upon the evidence presented in the record, whether the same be presented by specifications of particulars in which the evidence is alleged to be insufficient or not, and determine the same, as well as questions of law, unless, for good cause, a new trial or the taking of further evidence in the court below be ordered; provided, that nothing herein shall be con-

strued to abridge, in any manner, the powers of the supreme court in other cases."

In Finlen v. Heinze, 32 Mont. 354, 380, 80 Pac. 918, 924, this court held the statute, now section 93-216, supra, as amended, to be constitutional and then said: "This act * * * requires us to *review* the facts as presented in the record, and under like statutory provisions it is quite generally held that the appellate court can either render a judgment itself, or direct what proper judgment shall be entered in the trial court."

The record before this court is most exhaustive and revealing. It shows that the parties lived together but three years, six months and four days. Since then each party has gone his and her own separate way. More than four and a quarter years have elapsed since plaintiff commenced this suit. During all of this time the hostilities have continued unabated. The district judge who presided throughout the trial of the case and who gave and rendered the final judgment therein has recused himself. If another trial is had it must be before another district judge. The marriage was and is definitely and irretrievably broken down. There is no prospect of reconciliation. No children are involved. The marriage has been of brief and turbulent duration. All the pertinent facts are now before the appellate court on a most exhaustive record after a long drawn out and most expensive trial in the district court. To decree a permanent separation without divorce would add to the tragedy, condemn the parties to enforced celibacy, turn them out neither married nor single, prevent each from again marrying and wreck and ruin their lives.

Those portions of the trial court's findings of fact, conclusions of law and judgment respecting, concerning or relating to the defendant's three life insurance policies should be vacated, set aside and stricken,—the policies should be ordered returned and redelivered to the defendant owner forthwith and, as so modified, the trial court's decree should be affirmed.

MR. JUSTICE BOTTOMLY: (dissenting).

I am in full agreement with and concur in the above dissenting opinion of Chief Justice Adair.

In her complaint the plaintiff has alleged facts constituting a cause of action for divorce and in his cross complaint the defendant has also alleged facts sufficient to state a cause of action for divorce. Whether either party is to be granted such relief depends upon the sufficiency of the proof offered in support of the allegations pleaded.

There was no desertion or failure to support charged to the husband in this case.

Where substantial credible proof has been supplied to establish all the essential allegations pleaded, it then is within the sound discretion of the trial judge as to whether a decree of divorce or one of separate maintenance shall be granted. Lingner v. Lingner, 165 Tenn. 525, 56 S.W. (2d) 749; Rohloff v. Rohloff, 224 Wis. 153, 11 N.W. (2d) 507, 509; Stefan v. Stefan, 152 Neb. 23, 39 N.W. (2d) 918, 920.

Where, as here, there appears no possibility of any reconciliation divorce should be granted. Coleman v. Coleman, Ky. 1954; 269 S.W. (2d) 730, at page 737; Lingner v. Lingner, supra; Clyburn v. Clyburn, 175 Ark. 330, 299 S.W. 38; Hudson v. Hudson, 151 Neb. 210, 36 N.W. (2d) 851. Experience has taught the courts that in such cases it is usually preferable to grant an absolute divorce. Phillips v. Phillips, 135 Neb. 313, 281 N.W. 22.

We have before us a proceeding of an equitable nature over which this court has jurisdiction on appeal. R.C.M. 1947, section 93-216.

A court of equity having secured jurisdiction will retain it for the purpose of awarding complete relief. Continental Supply Co. v. White, 92 Mont. 254, 269, 12 Pac. (2d) 569; Merhcants Fire Assur. Corp. v. Watson, 104 Mont. 1, 12, 64 Pac. (2d) 617; Reickhoff v. Consolidated Gas Co., 123 Mont. 555,

568, 217 Pac. (2d) 1076; Epleveit v. Solberg, 119 Mont. 45, 60, 169 Pac. (2d) 722.

As was said in Lowry v. Carrier, 55 Mont. 392, 397, 177 Pac. 756, 759, ''The evidence in its entirety is before us, and we are authorized by section 6253 [now R.C.M. 1947, section 93-216], Revised Codes, *to dispose of the cause on its merits.*'' Emphasis supplied. Also see Bosanatz v. Ostronich, 57 Mont. 197, 204, 187 Pac. 1009.

In this case the evidence was substantial and sufficient to warrant the trial court's judgment dissolving the marriage and to limit the contribution for maintenance to the period of time and amount adjudged and, with the modifications suggested in the Chief Justice's dissent, such judgment should be affirmed.